UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMILY C. KROLL,

    Plaintiff,

-vs-                                              Case No: 1:09cv626
                                                      Honorable Gordon J. Quist

WHITE LAKE AMBULANCE
AUTHORITY,

    Defendant.
_____/

| Bradley K. Glazier  (P35523) | Robert A. Callahan  (P47600) |
|---|---|
| BOS & GLAZIERS, PLC | PLUNKETT COONEY |
| Attorney for Plaintiff | Co-Counsel for Defendant |
| 990 Monroe Ave., NW | 950 Trade Centre Way, Suite 310 |
| Grand Rapids, MI  49503 | Kalamazoo, MI  49002 |
| (616)  458-6814 | (269)  382-5935 |
|  | Douglas M. Hughes  (P30958) |
|  | WILLIAM HUGHES & COOK PLC |
|  | Co-Counsel for Defendant |
|  | 120 W. Apple Ave. |
|  | PO Box 599 |
|  | Muskegon, MI 49443 |
|  | (231) 727-2119 |

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION.**

    Plaintiff, Emily Kroll, is a former employee of the White Lake Ambulance Authority ("WLAA").  She served as part-time emergency medical technician ("EMT").The WLAA is a municipal entity, formed by various municipalities north of the City of Muskegon, as an intra-governmental entity pursuant to Michigan statute.

    The facts which were developed through discovery demonstrate Plaintiff has a long standing history of emotional and behavioral problems.  Unfortunately, Plaintiff's emotional and

behavioral problems affected how she interacted at work to the point where in April, 2008, she was advised she needed to undergo counseling and/or therapy. Plaintiff announced she would not do that and turned in her equipment, and has not worked at WLAA since.

As discussed, *infra,* Plaintiff was not subjected to any discrimination on the basis of gender. Further, the actions by WLAA, specifically the decision made by the Director, Brian Binns, were based on the information provided to him, rendering it a business necessity for Plaintiff to undergo the counseling and therapy. Further, WLAA did not retaliate against Plaintiff for exercising any rights she had available under the Americans with Disabilities Act ("ADA"). Accordingly, Defendant WLAA respectfully submits this Court must grant its motion for summary judgment, and dismiss Plaintiff's complaint with prejudice.

## II. FACTUAL BACKGROUND.

### A. Plaintiff's Position At White Lake Ambulance Authority.

Plaintiff was hired at WLAA as an EMT Basic on October 22, 2003. As an EMT Basic, she traveled with a paramedic in a White Lake Ambulance vehicle to assist in the rendering of care to injured or ill individuals. She operated the ambulance while the paramedic provided assistance, care, and treatment to the patient enroute to the hospital.

This case is not about whether Plaintiff could perform the technical requirements of her job as an EMT. This case is about Plaintiff's mental and emotional stability, the impact of Plaintiff bringing her overwhelming personal issues into the WLAA workplace, and the potential impact it could have on WLAA employees, patients, equipment, and the public at large.

### B. Plaintiff's Mental And Emotional Health History.

Defendant has experienced difficulty in obtaining Plaintiff's mental and emotional health history. The records Defendant has obtained reveals an individual with long-standing problems.

Attached, as **Exhibit A**, are Plaintiff's records from Community Mental Health for Muskegon County arising from treatment in 2004. At that time, she was seeking help because three weeks previously she had an abortion. She was relating to Dr. Kennedy that she felt incomplete, empty, and that she had always struggled with these feelings. She also related "a chronic pattern of moderate depression that has waxed and waned in intensity, frequency, and duration since late adolescence." She also related taking Prozac and other antidepressant agents since the age of 19. Between 2001-2002, she participated in psychotherapeutic services through Child & Family Services for depression, and "real bad relationships." She was diagnosed as having major depression disorder, recurrent, with partner-relational problems, and a dependent personality disorder.

Additional mental heath care records for Plaintiff from Community Health Services in Muskegon County, are attached as **Exhibit B.** In 2000, Plaintiff was relating the need to get stabilized on medication because her depression was worsening. Plaintiff was relating having experienced relationship problems throughout much of her life. In 2006, she was diagnosed with having bi-polar disorder, and attention deficit disorder.

The evidence in this case is also clear on numerous occasions, Plaintiff has become involved in sexual relationships with married men. She is noted to have lamented, on various occasions, that she just couldn't develop any relationships with single men. Plaintiff's sister, Elizabeth Johnson, testified Plaintiff experienced sadness because she was not married, and expressed frustration with not being able to find the right man. (**Exhibit C**, E. Johnson dep. tr., p. 9, line 22 through p. 10, line 12). Plaintiff repeatedly asked Jodi Osborn, at that time her friend, why she only attracted married men. (**Exhibit D,** J. Osborn dep. tr., p. 31, lines 10-19).

In 2004, Plaintiff had an abortion resulting from a relationship she was having with a fellow employee at the WLAA. In 2007, she started an affair with Joshua Easton, another employee at the WLAA. Easton testified the sexual phase of the affair lasted upwards of 4 months. He described his relationship with Plaintiff as "rocky," due to differences of opinion as to what form the relationship would take. (**Exhibit E,** J. Easton dep. tr., p. 11, lines 6-22). Easton promised Plaintiff he was going to get a divorce. He never carried through on his promise. (**Exhibit E**, p. 12, lines 7-10). Plaintiff expressed concerns why Easton wasn't getting divorced, and showed jealousy towards him. (**Exhibit E**, p. 13, line 14 through p. 14, line 2). Easton testified he attempted to break off the relationship with Plaintiff on several occasions. One of the occasions occurred when he became jealous because Plaintiff was not focusing enough attention on him. (**Exhibit E**, p. 18, line 18 through p. 19, line 8).

During his deposition, Easton testified to an incident which occurred on Valentine's Day, 2008, when he gave Plaintiff roses, and found out that she had received roses from another man. Plaintiff testified she became depressed after Easton accused her of being with another man. Plaintiff identified Derrick Roesler as the other man from whom she received the flowers. This made Easton jealous, and prompted him to find out man gave Plaintiff the roses. (**Exhibit E**, p. 45, lines 6-25). Plaintiff testified when Easton became jealous, he checked the messages on her cell phone. Plaintiff testified after Easton found out she had received flowers from another man they got into a fight, in which Plaintiff yelled at him. (**Exhibit F**, Plaintiff dep. tr., p. 144, line 22 through p. 147, line 6).

Numerous employees testified about Plaintiff getting into verbal confrontations and yelling at fellow employees. They characterized Plaintiff's actions as bringing her personal life into the work place. (**Exhibit D**, p. 22, lines 12-13; p. 26, lines 2-8: **Exhibit G**, J Betka dep. tr.,

4

p. 12, line 23 through p. 13, line 12; p. 14, line 23 through p. 15, line 12).  Easton was not satisfied with merely checking Plaintiff's phone records.  He decided to hack into her e-mail account to read her e-mails.  (**Exhibit E**, p. 31, lines 1-13).  This caused Plaintiff to break down and cry.  She yelled at Easton over hacking into her e-mail account.  (**Exhibit E,** p. 32., line 22 through p. 33, line 7).  Easton testified while he was working, Plaintiff would send him text messages or e-mails, inquiring what he was doing.  (**Exhibit E**, p. 14, lines 10-16).  He further testified Plaintiff called him to scream and yell at him over the phone.  (**Exhibit E,** p. 16, lines 20-24).  Mark Terpstra, a paramedic, testified Plaintiff would on occasion talk to and argue with Easton on her cell phone while she operated an ambulance.  (**Exhibit H,** M. Terpstra, dep. tr., p. 23, lines 14 through p. 25, line 16; p. 30, lines 14-16; p. 32, lines 3-20).  There is no question that Brian Binns had banned cell phone usage while operating a White Lake Ambulance Authority vehicle.  (**Exhibit I**).  In his April 6, 2005, memo to White Lake Ambulance Authority staff, Binns clearly articulated the dangers associated with operating a vehicle while using a cell phone.

In addition to using a cell phone and arguing with Easton while she was operating an ambulance, Plaintiff also used her cell phone to send text messages to Easton while operating the WLAA's ambulance.  (**Exhibit E**, p. 14, lines 10-16; **Exhibit D**, p. 28, line 23 through p. 29, line 15; **Exhibit H**, p. 40, line 5 through p. 41, line 9).[1]  Both Jodi Osborn and Mark Terpstra talked to Plaintiff about their concerns regarding her arguing with Easton on the cell phone and texting while operating an ambulance.  Plaintiff did not respond to their concerns.  Moreover, and most importantly for this Court's analysis, the concerns of Mark Terpstra and Jodi Osborn pertaining

---

[1] Through the process of discovery the Authority attempted to obtain discovery from Plaintiff of her cell phone and text usage.  Plaintiff has obstructed the Authority in those efforts.  Indeed, she got rid of her cell phone and destroyed her computer during the time frame that she had the EEOC complaint filed and was setting up this dispute for litigation.  Plaintiff's spoliation of evidence must lead to an adverse inference against her.

to Plaintiff's actions while operating an ambulance were communicated to Jean Dresen and to Brian Binns.(**Exhibit D**, p. 21, lines 15-18, p. 29, line 24 through p. 30, line 14: **Exhibit H**, p. 25, line 14 through p. 27, line 18; p. 32, lines 3-20).

During the spring of 2008, Plaintiff developed a friendship with a fellow employee, Amy Callison. Amy Callison prepared a written statement for White Lake Ambulance Authority, because she was concerned about Plaintiff. (**Exhibit J**, A. Callison, dep. tr. p, 6, lines 14-22). Callison testified she went to Binns to express her concerns about Plaintiff's well-being. During her deposition, Callison testified as follows:

> Q   What did you tell Brian Binns in that occasion that you met with him?
>
> A   That I was concerned for her. That she needed counseling. And I even told Emily that she needed counseling. I think that would help her in the long run to go through, because she was an emotional wreck.

**Exhibit J,** p. 12, lines 5-10.[2]

Amy Callison further testified in the spring of 2008 she felt that Plaintiff was suicidal, that Plaintiff was extremely emotional, and she did not want Plaintiff to hurt herself. She reported these concerns to Binns. (**Exhibit J**, p. 14, lines 1-9). Callison went to talk to Binns after she had talked to Plaintiff about the need for counseling, and Plaintiff refused. (**Exhibit J**, p. 15, lines 4-12). Callison testified it got so bad that she finally had to request Plaintiff to stop texting her. Plaintiff was texting Callison all the time, and Callison's phone bills were getting too high. (**Exhibit J,** p. 18, lines 7-14). Callison further testified to an incident in which Plaintiff followed her to a grocery store, parked next to Callison's vehicle, and when Callison got out of the store, Plaintiff was in her car "bawling." (**Exhibit J**, p. 15, line 20 through p. 16, line

---

[2]The testimony of Amy Callison is extremely probative, as she is no longer employed with White Lake Ambulance Authority, having moved out of the area due to her husband's change in jobs.

6

20). Callison further testified on several occasions Plaintiff told her she "wanted to go into a big black hole and disappear." Callison testified when Plaintiff reported this to her, she finally decided she needed to go to Binns and tell him that something needed to be done, because Plaintiff possibly was suicidal. (**Exhibit J**, p. 18, line 25 through p. 19, line 13).

Jean Dresen was inundated with reports from fellow employees of concerns about Plaintiff's emotional well-being. (**Exhibit K**, J. Dresen, dep. tr., p. 27, line 9 through p. 30, line 15; see also **Exhibit L**). Indeed, on one occasion, Plaintiff called Dresen at night while Plaintiff was on duty at the WLAA. Plaintiff was crying. Dresen communicated this incident to Binns, as well. (**Exhibit K**, p. 23, lines 4-25).

In response, Binns tried to verify with WLAA employees of their observations of Plaintiff's emotional well-being. Plaintiff's good friend, Kathy Sturgis, testified Binns approached her in April, 2008, advised he had been receiving information from people that Plaintiff was emotionally unstable, and solicited her opinion. Sturgis also heard that Kroll had been reported as using her cell phone and texting while operating an ambulance before Plaintiff was requested to seek counseling. Binns also expressed his concern to Sturgis about the report of Plaintiff using a cell phone or texting while operating an ambulance. (**Exhibit M**, K. Sturgis dep. tr., p. 26, line 18 through p. 28, line 24).[3]

A week prior to April 28, 2008, Jean Dresen and Brian Binns talked about their mutual concerns with the behavior being manifested by Emily Kroll. Binns directed Dresen to contact Hackley Work Place Health to see if they could find someone to assist Plaintiff. (**Exhibit K**, p. 35, line 25 through p. 36, line 4; **Exhibit N,** B. Binns dep. tr., p. 66, line 7-12). Accordingly, Dresen contacted Plaintiff and told her about possible arrangements to receive therapy or

---

[3] Kathie Sturgis can not be considered a witness in the hip pocket of White Lake Ambulance Authority, as she was discharged from employment later in 2008, and presently has pending charges against the Authority in the EEOC.

counseling. Dresen requested Plaintiff to sign a release so the WLAA could verify Plaintiff was attending the weekly meetings. In 2007, Plaintiff had agreed she had needed some counseling and therapy at that time, and Dresen later found out that Plaintiff had never attended and lied about having done so. (**Exhibit K,** p. 39, line 23 through p. 41, line 6).

The problems with Plaintiff came to a head on April 28, 2008. Prior to that date, Plaintiff had forwarded to Jodi Osborn an e-mail which Plaintiff previously had sent to Easton. In the e-mail, Plaintiff was inquiring of Easton as follows: "Have u done Jodi? Or anything sexually with her at all?" (**Exhibit O; Exhibit F,** p. 155, line 6-25; p. 166, lines 11 through p. 167, line 10). Plaintiff and Osborn got into an argument during an ambulance call regarding the e-mail Plaintiff had forwarded to Osborn. (**Exhibit F,** p. 167, lines 3-17; **Exhibit D**, p. 16, lines 2-22). During the argument between Plaintiff and Osborn, they were in back of the ambulance administering care to a patient. Osborn, as the paramedic, requested that Plaintiff administer oxygen to the patient. Plaintiff failed to respond to this order. Plaintiff was right next to Osborn when she requested Plaintiff to administer the oxygen to the Plaintiff, so there was no question Plaintiff heard Osborn's directive. (**Exhibit D**, p. 26, line 9 through p. 27, line 24). When she got back to the WLAA garage, Osborn told Binns about Plaintiff's behavior on the ambulance run, and Plaintiff's failure to follow her request to administer oxygen to the patient. (**Exhibit D**, p. 35, line 25 through p. 36, line 4).

Plaintiff and her father went to the ambulance garage around noon to talk to Binns. Prior to Binns talking to Plaintiff, he talked to Kathie Sturgis about Plaintiff's problems. Binns told Sturgis he was going to tell Plaintiff she had to go to counseling, and that Plaintiff would be able to retain her job. (**Exhibit M**, p. 50, line 12 through p. 51, line 7).

When Plaintiff and her father got to the WLAA, a discussion and argument ensued. Plaintiff was advised the WLAA had set up possible arrangements for counseling or therapy for her, that she needed to go to the counseling or therapy, and that she would be able to retain her job. Plaintiff testified she refused to go to the individual Dresen had lined up, because Plaintiff had been advised the counselor was a neighbor and friend of Dresen. (**Exhibit F**, p. 139, line 4 through p. 140, line 12). Importantly, Plaintiff concedes that as of April 28, 2008, she had emotional problems which required treatment or therapy. She testified she needed the treatment or therapy because of "the abuse that I went through from Josh . . . and . . . the abuse I went through working there with some of the people." (**Exhibit F**, p. 175, line 24 through p. 176, line 6). Plaintiff further testified the treatment or counseling was not offered free of charge, and that if she had the funds to get the treatment or counseling she would have gone. (**Exhibit F**, p 177, line 24 through p. 178, line 10). In any event, Plaintiff refused to seek any treatment or therapy, threw her equipment on Binns' desk, turned on her heels, and walked out. Plaintiff has not worked at the WLAA since.

### III. LEGAL ANALYSIS.

#### A. Defendant Did Not Violate The Americans With Disabilities Act.

In Counts I and II of her complaint, Plaintiff alleges WLAA violated the ADA. In Count I, she alleges WLAA violated the ADA when it required her to undergo a medical examination which was neither job related nor consistent with a business necessity. In Count II, Plaintiff alleges WLAA retaliated against her for opposing acts made unlawful by the ADA. Each of these claims shall be addressed in turn.

>       **1.       White Lake Ambulance Authority did not violate the ADA when it required Plaintiff to participate in therapy or counseling.**

It is clear, and uncontroverted, that the WLAA did not require Plaintiff to undergo a medical examination or inquiry.  Instead, the WLAA required that Plaintiff receive counseling and/or therapy because of the problems that she was manifesting.  The specific provisions of the ADA upon which Plaintiff relies are 42 U.S.C. §12112(d)(4) which provides "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability, or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity."  Plaintiff also relies on 29 C.F.R. 1630.14(c), which provides:

> A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

These provisions of the ADA, and its accompanying regulations simply are inapposite to Plaintiff's claims.  Plaintiff was being required to receive ***treatment*** in order to cope with her problems.  She was not being required to undergo an examination or inquiry.

Moreover, assuming *arguendo* Plaintiff was required to undergo an examination, the actions taken by WLAA were absolutely justified and protected.  In support of its argument, Defendant relies on *Sullivan v River Valley School District*, 197 F.3d 804 (6th Cir. 1999).  In *Sullivan*, a school district required a high school teacher to undergo mental and psychological examinations to ascertain his fitness for duty.  The school district took this action in light of certain behaviors manifested by Sullivan, which the school district characterized as "odd behavior."  *Id*. at 808-809.  When Sullivan refused to submit to the examinations, his employment was terminated.  Sullivan claimed he was discriminated against on the basis of his

10

disability, and was retaliated against for exercising his rights protected by the ADA. In the course of reaching its decision, the Court in *Sullivan* held that "post-hiring demands for examinations can only be made where shown to be `job-related and consistent with business necessity.'" The employer must demonstrate significant evidence which would cause a reasonable person to inquire whether an employee is still capable for performing her job. An employee's behavior can not be merely annoying or insufficient to justify an examination. Instead, there must be genuine reason to doubt whether the employee can perform job related functions. *Id.* at 811.

The Court in *Sullivan* further went on to note that any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill essential functions of the job. This is referred to as a "fitness-for-duty examination." *Id*. at 811-12. It further was noted employers such as the WLAA are permitted to use reasonable means to ascertain the cause of troubling behavior, without exposing them to ADA claims. *Id.* at 811, quoting *Cody v. CIGNA Health Care of St. Louis, Inc*, 139 F.3d 595, 599 (8th Cir. 1998); *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007).

In the case before this Court, the record is replete with problems Plaintiff was demonstrating in the work place in springtime of 2008. Plaintiff was getting into arguments with other employees, most particularly Josh Easton. She was operating, or reported to be operating the ambulance while arguing on a cell phone in violation of written policies. She also was reported as using her cell phone to send text messages to individuals while operating the ambulance. Brian Binns further heard from Amy Callison about her concerns that Plaintiff was suicidal, and was in a "black hole." Finally, on April 28, 2008, Brian Binns was notified that because of an argument between Plaintiff and Jodi Osborn, Plaintiff refused to administer

11

oxygen to a patient. No doubt Plaintiff will deny that some of these actions occurred, or will attempt to minimize the events. The fact remains that Plaintiff was *reported* as manifesting certain aberrant, troubling, and dangerous behaviors, while she was on the job in April, 2008. Brian Binns testified as follows during his deposition:

> A    I couldn't risk having her take out a patient, herself, her partner, or anybody else who happened to get in the way on the highway at 80 miles an hour with lights and sirens because, as you know as an attorney, people don't really pay a whole lot of attention to emergency vehicles responding to an emergency. I was concerned about the well-being of the Ambulance Authority and, most of all, the individuals in that vehicle, including and maybe even above the employees, because that person didn't ask to be back there in the ambulance. They were there for health reasons, and health reasons were number one with me.

**Exhibit N,** p. 99, line 18 through p. 100, line 3.

During the course of this lawsuit, Plaintiff was ordered to submit to an independent medical examination by psychologist, Dr. Joseph Auffrey. A copy of Dr. Auffrey's report resulting from the independent medical examination is attached as **Exhibit P.** Dr. Auffrey rendered a diagnosis of a depressive disorder by history, and Plaintiff having suffered significant depression with accompanying anxiety over the years. He further opined Brian Binns acted appropriately in his decision to require psychological counseling for the Plaintiff.

> It seems that this man was presented with ample and duplicative evidence of emotional upset, distraction, and possible mental illness. It is certainly possible that Ms. Kroll may have represented a risk to patients and fellow workers on the job. Mr. Binns would have been remiss if he had chosen to ignore significant evidence of Ms. Kroll's troublesome emotional state.

Notably, Plaintiff testified, during her deposition, as follows:

> Q    Would you agree with me that if you were crying through 9-1-1 calls, and unable to control your emotions, that would have been a significant problem for the authority?
>
> A    Yes. But what does he mean by 9-1-1 calls?

> Q   Okay.  I'm just asking you, if you were exhibiting these kind of behaviors, that would be a significant problem for the Authority, correct?
>
> A   More than likely.
>
> Q   And if Mr. Binns was advised that these events were taking place, should he have done something about it?
>
> A   Yes.
>
> Q   Mr. Terpstra also stated in his statement that you would carry on with phone calls and text message arguments with people while driving apparatus to the hospital with a patient.  Did that ever occur?
>
> A   No.
>
> Q   That would present a safety issue, correct?
>
> A   Correct.

**Exhibit F,** p. 134, lines 1-18

Assuming requiring Plaintiff to undergo counseling or therapy is the equivalent of an employee to undergo a medical examination or inquiry, there is more than ample evidence of the compelling business necessity for the WLAA that Plaintiff receive that treatment and therapy.  It is respectfully submitted that Plaintiff's claims asserted in Count I of her complaint must be dismissed with prejudice.

### 2. Plaintiff was not retaliated against for refusal to submit to unlawful examination.

Plaintiff alleges in Count II of her complaint that she was retaliated against, through termination of her employment, for refusal to submit to an unlawful examination.  As previously set forth, she was not being required to submit to an examination.  Instead, she was being required to receive treatment to help her control her moods and emotions.

In order to prevail on a retaliation claim, Plaintiff must demonstrate that she engaged in protected activity; that she suffered adverse employment action; and that a causal connection

13

exists between her alleged protected activity and the adverse action. *Sullivan, supra* at 814. Plaintiff was not retaliated against. She was advised she would have her job when she completed the therapy or counseling. Indeed, Plaintiff's claim is not dissimilar to the theory asserted by the plaintiff in *Sullivan v River Valley School District*, *supra*, in which the Court stated as follows:

> From Sullivan's argument, it is not at all clear what the supposed protected activity was. If it was refusing to submit to the mental and physical exams, then the retaliation argument is logically incoherent. Plaintiff would be arguing that Defendants ordered him to undergo mental and physical examinations in retaliation for his refusing to undergo mental and physical examinations. But obviously the Defendants could not have been retaliating for Sullivan's not doing something that they had not yet asked him to do. If the supposed protected activity was something else, Sullivan has not shown how any of his other behavior was a protected means of opposing an act or practice made illegal by the ADA. . . . For this reason, ordering Sullivan to undergo the examinations was not itself an adverse employment action, and suspending him for refusing to comply was not retaliatory.

In similar fashion, Plaintiff has not been retaliated against for opposing any act made unlawful by the ADA. Accordingly, the retaliation claim, set forth in Count II of Plaintiff's complaint, must be dismissed.

### B. Plaintiff Did Not Experience Discrimination Based Upon Gender.

In her complaint, Plaintiff alleges that she was discriminated against when she was required to undergo counseling for having an affair with a married man, while male employees were treated differently when participating in a romantic relationship while married.

Plaintiff clearly attempts to posture the actions by the WLAA simply as a decision to require her to undergo counseling and therapy *because* she was engaging in an affair. The evidence compels the conclusion that Plaintiff was requested to go to counseling and therapy because of the problems she was manifesting at work. During his deposition, Binns testified he did not consider Plaintiff's alleged promiscuous behavior in making his determinations. (**Exhibit N,** p. 100). Binns testified he never heard anyone make any comments regarding

14

behaviors by Josh Easton, as he had heard related as to Plaintiff. (**Exhibit N,** p. 103, lines 10-23). Moreover, during her deposition Plaintiff testified she never heard anyone at WLAA reporting or observing any similar type of problems with Josh Easton as were reported about her. (**Exhibit F**, p. 219, line 14 through p. 220, line 7).

In order to prevail on a gender discrimination claim, Plaintiff must establish she was a member of a protected class, she was subjected to an adverse employment action, and she was qualified for the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Plaintiff establishes this, then it is up to Defendant White Lake Ambulance Authority to articulate legitimate, non-discriminatory reasons for the adverse actions. *Id*. at 802. In this case, White Lake Ambulance Authority has proffered an overwhelmingly large amount of legitimate, non-discriminatory reasons for requiring Plaintiff to go to counseling and therapy.

Furthermore, in order to proceed on a disparate treatment theory, Plaintiff must show she was at all times similarly situated to the individual who she claims was treated more favorably. In this case, that would be Josh Easton. Plaintiff must establish that Josh Easton was similarly situated to her in all relevant aspects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (1998). As testified to by Plaintiff herself, there is no evidence of Josh Easton engaging in aberrant and troublesome behavior such as Plaintiff exhibited in April, 2008, or even that behavior being reported to Brian Binns. Accordingly, Plaintiff can not claim she was similarly situated to Josh Easton in all relevant aspects. As a matter of fact and law, Plaintiff can not proceed any further on a claim for discrimination on the basis of her gender. It is respectfully submitted Plaintiff's gender discrimination claim, as set forth in Count III of her complaint, must be dismissed.

**IV.     CONCLUSION.**

White Lake Ambulance Authority concedes that from a technical standpoint, Plaintiff performed well as an EMT Basic.  However, Plaintiff's mental and emotional problems led to her bringing her personal life into WLAA, such that it became so troublesome in the spring of 2008 that she had to be required to seek counseling and therapy to get her emotions and behaviors under control.  The WLAA clearly would have been remiss if it failed to take actions to protect its personnel, patients, equipment and the public at large.  At no time did Defendant White Lake Ambulance Authority violate the American with Disabilities Act, or discriminate against Plaintiff on the basis of her gender.  It is respectfully submitted that Plaintiff's spurious and ill founded complaint be dismissed, with prejudice, and an order of summary judgment be granted to White Lake Ambulance Authority.

Dated  June 9, 2010                                    Respectfully submitted,

                                                                    PLUNKETT COONEY


                                                                    By:   /s/ Robert A. Callahan
                                                                            Robert A. Callahan (P47600)
                                                                            Attorney for Defendant
                                                                            950 Trade Centre Way, Suite 310
                                                                            Kalamazoo, MI  49002
                                                                            **Direct Dial:  269/226-8856**

Branches.00560.92390.1989127-1