# EXHIBIT 8

*The U.S. Equal Employment Opportunity Commission*

| | | Number |
|---|---|---|
| **EEOC** | ***NOTICE*** | 915.002 |
| | | **Date** |
| | | 7/27/00 |

1. SUBJECT: EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)

2. PURPOSE: This enforcement guidance explains when it is permissible foremployers to make disability-related inquiries or require medical examinations of employees.

3. EFFECTIVE DATE: Upon receipt.

4. EXPIRATION DATE: As an exception to EEOC Order 205.001, Appendix B,Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. ORIGINATOR: ADA Division, Office of Legal Counsel.

6. INSTRUCTIONS: File after Section 902 of Volume II of the Compliance Manual.


```
7/27/00                     /s/
Date                        Ida L. Castro
                            Chairwoman
```


**DISTRIBUTION: CM Holders**

# ENFORCEMENT GUIDANCE: DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH

# DISABILITIES ACT (ADA)

## TABLE OF CONTENTS

INTRODUCTION

GENERAL PRINCIPLES

  Background

  Disability-Related Inquiries and Medical Examinations of Employees

JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY

  In General

  Scope and Manner of Disability-Related Inquiries and Medical
  Examinations

  Disability-Related Inquiries and Medical Examinations Relating to
  Leave

  Periodic Testing and Monitoring

OTHER ACCEPTABLE DISABILITY-RELATED INQUIRIES AND MEDICAL
EXAMINATIONS OF EMPLOYEES

INDEX

## Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the list of specific changes to the ADA made by the ADA Amendments Act.

# INTRODUCTION

Title I of the Americans with Disabilities Act of 1990 (the "ADA")[1] limits an employer's ability to make disability-related inquiries or require medical examinations at three stages: pre-offer, post-offer, and during employment. In its guidance on preemployment disability-related inquiries and medical examinations, the Commission addressed the ADA's restrictions on disability-related inquiries and medical examinations at the pre- and post-offer stages.[2] This enforcement guidance focuses on the ADA's limitations on disability-related inquiries and medical examinations during employment.[3]

Disability-related inquiries and medical examinations of employees must be "job-related and consistent with business necessity." This guidance gives examples of the kinds of questions that are and are not "disability-related" and examples of tests and procedures that generally are and are not "medical." The guidance also defines what the term "job-related and consistent with business necessity" means and addresses situations in which an employer would meet the general standard for asking an employee a disability-related question or requiring a medical examination. Other acceptable inquiries and examinations of employees, such as inquiries and examinations required by federal law and those that are part of voluntary wellness and health screening programs, as well as invitations to voluntarily self-identify as persons with disabilities for affirmative action purposes, also are addressed.[4]

# GENERAL PRINCIPLES

## A. Background

Historically, many employers asked applicants and employees to provide information concerning their physical and/or mental condition. This information often was used to exclude and otherwise discriminate against individuals with disabilities -- particularly nonvisible disabilities, such as diabetes, epilepsy, heart disease, cancer, and mental illness -- despite their ability to perform the job. The ADA's provisions concerning disability-related inquiries and medical examinations reflect Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs.[5]

Under the ADA, an employer's ability to make disability-related inquiries or require medical examinations is analyzed in three stages: pre-offer, post-offer, and employment. At the first stage **(prior to an offer of employment)**, the ADA prohibits all disability-related inquiries and medical examinations, *even if* they are related to the job.[6] At the second stage **(after an applicant is given a conditional job offer, but before s/he starts work)**, an employer may make disability-related inquiries and conduct medical examinations, regardless of whether they are related to the job, as long as it does so for all entering employees in the same job category.[7] At the third stage **(after employment begins)**, an employer may make disability-related inquiries and require medical examinations *only* if they are job-related and consistent with business necessity.[8]

The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination (including medical information from voluntary health or wellness programs [9]), as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA.[10]

## B. Disability-Related Inquiries and Medical Examinations of Employees

The ADA states, in relevant part:

> A covered entity[11] shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[12]

This statutory language makes clear that the ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities. Unlike other provisions of the ADA which are limited to qualified individuals with disabilities,[13] the use of the term "employee" in this provision reflects Congress's intent to cover a broader class of individuals and to prevent employers from asking questions and conducting medical examinations that serve no legitimate purpose.[14] Requiring an individual to show that s/he is a person with a disability in order to challenge a disability-related inquiry or medical examination would defeat this purpose.[15] *Any* employee, therefore, has a right to challenge a disability-related inquiry or medical examination that is not job-related and consistent with business necessity.

Only disability-related inquiries and medical examinations are subject to the ADA's restrictions. Thus, the first issue that must be addressed is whether the employer's question is a "disability-related inquiry" or whether the test or procedure it is requiring is a "medical examination." The next issue is whether the person being questioned or asked to submit to a medical examination is an "employee." If the person is an employee (rather than an applicant or a person who has received a conditional job offer), the final issue is whether the inquiry or examination is "job-related and consistent with business necessity" or is

otherwise permitted by the ADA.[16]

1. What is a **"disability-related inquiry"**?

In its guidance on Preemployment Questions and Medical Examinations, the Commission explained in detail what is and is not a disability-related inquiry.[17] A "disability-related inquiry" is a **question (or series of questions) that is likely to elicit information about a disability.**[18] The same standards for determining whether a question is disability-related in the pre- and post-offer stages apply to the employment stage.[19]

Disability-related inquiries may include the following:

- asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability;[20]
- asking an employee to provide medical documentation regarding his/her disability;
- asking an employee's co-worker, family member, doctor, or another person about an employee's disability;
- asking about an employee's genetic information;[21]
- asking about an employee's prior workers' compensation history;[22]
- asking an employee whether s/he currently is taking any prescription drugs or medications, whether s/he has taken any such drugs or medications in the past, or monitoring an employee's taking of such drugs or medications;[23] and,
- asking an employee a **broad** question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?).[24]

**Questions that are not likely to elicit information** about a disability are *not* disability-related inquiries and, therefore, are not prohibited under the ADA.

**Questions that are permitted** include the following:

- asking generally about an employee's **well being** (e.g., How are you?), asking an employee who looks tired or ill if s/he is feeling okay, asking an employee who is sneezing or coughing whether s/he has a cold or allergies, or asking how an employee is doing following the death of a loved one or the end of a marriage/relationship;
- asking an employee about nondisability-related impairments (e.g., How did you break your leg?)[25]
- asking an employee whether s/he can perform job functions;
- asking an employee whether s/he has been drinking;[26]
- asking an employee about his/her **current illegal use of drugs**;[27]
- asking a pregnant employee how she is feeling or when her baby is due;[28] and,
- asking an employee to provide the name and telephone number of a person to contact in case of a medical emergency.

2. What is a **"medical examination"**?

A "medical examination" is a **procedure or test that seeks information about an individual's**

**physical or mental impairments or health**.[29] The guidance on Preemployment Questions and Medical Examinations lists the following factors that should be considered to determine whether a test (or procedure) is a medical examination: (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task ; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.[30]

In many cases, a combination of factors will be relevant in determining whether a test or procedure is a medical examination. In other cases, one factor may be enough to determine that a test or procedure is medical.

**Medical examinations** include, but are not limited to, the following:

- vision tests conducted and analyzed by an ophthalmologist or optometrist;
- blood, urine, and breath analyses to check for alcohol use;[31]
- blood, urine, saliva, and hair analyses to detect disease or genetic markers (e.g., for conditions such as sickle cell trait, breast cancer, Huntington's disease);
- blood pressure screening and cholesterol testing;
- nerve conduction tests (i.e., tests that screen for possible nerve damage and susceptibility to injury, such as carpal tunnel syndrome);
- range-of-motion tests that measure muscle strength and motor function;
- pulmonary function tests (i.e., tests that measure the capacity of the lungs to hold air and to move air in and out);
- psychological tests that are designed to identify a mental disorder or impairment; and,
- diagnostic procedures such as x-rays, computerized axial tomography (CAT) scans, and magnetic resonance imaging (MRI).

There are a **number of procedures and tests employers may require that generally are not considered medical examinations**, including:

- tests to determine the **current illegal use of drugs**;[32]
- **physical agility tests**, which measure an employee's ability to perform actual or simulated job tasks, and **physical fitness tests**, which measure an employee's performance of physical tasks, such as running or lifting, as long as these tests do not include examinations that could be considered medical (e.g., measuring heart rate or blood pressure);
- tests that evaluate an employee's ability to read labels or distinguish objects as part of a demonstration of the ability to perform actual job functions;
- **psychological tests** that measure personality traits such as honesty, preferences, and habits; and,
- polygraph examinations.[33]

3. Who is an **"employee"**?

The ADA defines the term "employee" as "an individual employed by an employer."[34] As a general rule, an individual is an employee if an entity controls the means and manner of his/her work performance.[35]

Where more than one entity controls the means and manner of how an individual's work is done, the individual is an employee of each entity.

> Example: XYZ, a temporary employment agency, hires a computer programmer and assigns him to Business Systems, Inc. (BSI), one of its clients. XYZ determines when the programmer's assignment begins and pays him a salary based on the number of hours worked as reported by BSI. XYZ also withholds social security and taxes and provides workers' compensation coverage. BSI sets the hours of work, the duration of the job, and oversees the programmer's work. XYZ can terminate the programmer if his performance is unacceptable to BSI.
>
> The programmer is an employee of both XYZ and BSI. Thus, XYZ and BSI may ask the programmer disability-related questions and require a medical examination only if they are job-related and consistent with business necessity.

4. How should an employer treat an employee who **applies for a new (i.e., different) job with the same employer**?

An employer should treat an employee who *applies* for a new job as an **applicant** for the new job.[36] The employer, therefore, is prohibited from asking disability-related questions or requiring a medical examination before making the individual a conditional offer of the new position.[37] Further, where a current supervisor has medical information regarding an employee who is applying for a new job, s/he may not disclose that information to the person interviewing the employee for the new job or to the supervisor of that job.

After the employer extends an offer for the new position, it may ask the individual disability-related questions or require a medical examination as long as it does so for all entering employees in the same job category. If an employer withdraws the offer based on medical information (i.e., screens him/her out because of a disability), it must show that the reason for doing so was job-related and consistent with business necessity.

An individual is *not* an applicant where s/he is **noncompetitively** entitled to another position with the same employer (e.g., because of seniority or satisfactory performance in his/her current position). An individual who is temporarily assigned to another position and then returns to his/her regular job also is not an applicant. These individuals are employees and, therefore, the employer only may make a disability-related inquiry or require a medical examination that is job-related and consistent with business necessity.

> Example A: Ruth, an inventory clerk for a retail store, applies for a position as a sales associate at the same store. Ruth is an applicant for the new job. Accordingly, her employer may not ask any disability-related questions or require a medical examination before extending her a conditional offer of the sales associate position. Following a conditional offer of employment, the employer may ask disability-related questions and conduct medical examinations, regardless of whether they are related to the job, as long as it does so for all entering employees in the same job category.[38]
>
> Example B: A grade 4 clerk typist has worked in the same position for one year and received a rating of outstanding on her annual performance appraisal. When she was hired, she was told that she automatically would be considered for promotion to the next grade after 12 months of satisfactory performance. Because the clerk typist is noncompetitively entitled to a promotion, she is an employee and not an applicant. The employer, therefore, only may make a disability-related inquiry or require a medical examination that is job-related and consistent with business necessity.
>
> Example C: A newspaper reporter, who regularly works out of his employer's New York

headquarters, is temporarily assigned to its bureau in South Africa to cover the political elections. Because the reporter is on a temporary assignment doing the same job, he is an employee; the employer, therefore, may make disability-related inquiries or require medical examinations only if they are job-related and consistent with business necessity.

# JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY

Once an employee is on the job, his/her actual performance is the best measure of ability to do the job. When a need arises to question the ability of an employee to do the essential functions of his/her job or to question whether the employee can do the job without posing a direct threat due to a medical condition, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

## A. In General

5. When may a disability-related inquiry or medical examination of an employee be "**job-related and consistent with business necessity**"?

Generally, a disability-related inquiry or medical examination of an employee may be "job-related and consistent with business necessity" when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat[39] due to a medical condition."[40] Disability-related inquiries and medical examinations that follow up on a request for reasonable accommodation when the disability or need for accommodation is not known or obvious also may be job-related and consistent with business necessity. In addition, periodic medical examinations and other monitoring under specific circumstances may be job-related and consistent with business necessity.[41]

Sometimes this standard may be met when an employer knows about a particular employee's medical condition, has observed performance problems, and reasonably can attribute the problems to the medical condition. An employer also may be given **reliable information** by a credible third party that an employee has a medical condition,[42] or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat. In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

> Example A: For the past two months, Sally, a tax auditor for a federal government agency, has done a third fewer audits than the average employee in her unit. She also has made numerous mistakes in assessing whether taxpayers provided appropriate documentation for claimed deductions. When questioned about her poor performance, Sally tells her supervisor that the medication she takes for her lupus makes her lethargic and unable to concentrate.

> Based on Sally's explanation for her performance problems, the agency has a reasonable belief that her ability to perform the essential functions of her job will be impaired because of a medical condition.[43] Sally's supervisor, therefore, may make disability-related inquiries (e.g., ask her whether she is taking a new medication and how long the medication's side effects are expected to last), or the supervisor may ask Sally to provide documentation from her health care provider explaining the effects of the medication on Sally's ability to perform her job.

> Example B: A crane operator works at construction sites hoisting concrete panels weighing several tons. A rigger on the ground helps him load the panels, and several other workers help him position them. During a break, the crane operator appears to become light-headed, has to sit down abruptly, and seems to have some difficulty catching his breath. In

response to a question from his supervisor about whether he is feeling all right, the crane operator says that this has happened to him a few times during the past several months, but he does not know why.

The employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat and, therefore, may require the crane operator to have a medical examination to ascertain whether the symptoms he is experiencing make him unfit to perform his job. To ensure that it receives sufficient information to make this determination, the employer may want to provide the doctor who does the examination with a description of the employee's duties, including any physical qualification standards, and require that the employee provide documentation of his ability to work following the examination.[44]

Example C: Six months ago, a supervisor heard a secretary tell her co-worker that she discovered a lump in her breast and is afraid that she may have breast cancer. Since that conversation, the secretary still comes to work every day and performs her duties in her normal efficient manner.

In this case, the employer does not have a reasonable belief, based on objective evidence, either that the secretary's ability to perform her essential job functions will be impaired by a medical condition or that she will pose a direct threat due to a medical condition. The employer, therefore, may not make any disability-related inquiries or require the employee to submit to a medical examination.

An employer's reasonable belief that an employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition must be based on *objective evidence* obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions.

Example D: An employee who works in the produce department of a large grocery store tells her supervisor that she is HIV-positive. The employer is concerned that the employee poses a direct threat to the health and safety of others because she frequently works with sharp knives and might cut herself while preparing produce for display. The store requires any employee working with sharp knives to wear gloves and frequently observes employees to determine whether they are complying with this policy. Available scientific evidence shows that the possibility of transmitting HIV from a produce clerk to other employees or the public, assuming the store's policy is observed, is virtually nonexistent. Moreover, the Department of Health and Human Services (HHS), which has the responsibility under the ADA for preparing a list of infectious and communicable diseases that may be transmitted through food handling,[45] does not include HIV on the list.[46]

In this case, the employer does *not* have a reasonable belief, based on objective evidence, that this employee's ability to perform the essential functions of her position will be impaired or that she will pose a direct threat due to her medical condition. The employer, therefore, may not make any disability-related inquiries or require the employee to submit to a medical examination.[47]

6. May an employer make disability-related inquiries or require a medical examination of an employee **based, in whole or in part, on information learned from another person**?

Yes, if the information learned is **reliable** and would give rise to a reasonable belief that the employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, an employer may make disability-related inquiries or require a medical examination.

Factors that an employer might consider in assessing whether information learned from another person is sufficient to justify asking disability-related questions or requiring a medical examination of an employee include: (1) the relationship of the person providing the information to the employee about whom it is being provided; (2) the seriousness of the medical condition at issue; (3) the possible motivation of the person providing the information; (4) how the person learned the information (e.g., directly from the employee whose medical condition is in question or from someone else); and (5) other evidence that the employer has that bears on the reliability of the information provided.

Example A: Bob and Joe are close friends who work as copy editors for an advertising firm. Bob tells Joe that he is worried because he has just learned that he had a positive reaction to a tuberculin skin test and believes that he has tuberculosis. Joe encourages Bob to tell their supervisor, but Bob refuses. Joe is reluctant to breach Bob's trust but is concerned that he and the other editors may be at risk since they all work closely together in the same room. After a couple of sleepless nights, Joe tells his supervisor about Bob. The supervisor questions Joe about how he learned of Bob's alleged condition and finds Joe's explanation credible.

Because tuberculosis is a potentially life-threatening medical condition and can be passed from person to person by coughing or sneezing, the supervisor has a reasonable belief, based on objective evidence, that Bob will pose a direct threat if he in fact has active tuberculosis. Under these circumstances, the employer may make disability-related inquiries or require a medical examination to the extent necessary to determine whether Bob has tuberculosis and is contagious.[(48)]

Example B: Kim works for a small computer consulting firm. When her mother died suddenly, she asked her employer for three weeks off, in addition to the three days that the company customarily provides in the event of the death of a parent or spouse, to deal with family matters. During her extended absence, a rumor circulated among some employees that Kim had been given additional time off to be treated for depression. Shortly after Kim's return to work, Dave, who works on the same team with Kim, approached his manager to say that he had heard that some workers were concerned about their safety. According to Dave, people in the office claimed that Kim was talking to herself and threatening to harm them. Dave said that he had not observed the strange behavior himself but was not surprised to hear about it given Kim's alleged recent treatment for depression. Dave's manager sees Kim every day and never has observed this kind of behavior. In addition, none of the co-workers to whom the manager spoke confirmed Dave's statements.

In this case, the employer does not have a reasonable belief, based on objective evidence, that Kim's ability to perform essential functions will be impaired or that s/he will pose a direct threat because of a medical condition. The employer, therefore, would not be justified in asking Kim disability-related questions or requiring her to submit to a medical examination because the information provided by Dave is not reliable.

Example C: Several customers have complained that Richard, a customer service representative for a mail order company, has made numerous errors on their orders. They consistently have complained that Richard seems to have a problem hearing because he always asks them to repeat the item number(s), color(s), size(s), credit card number(s), etc., and frequently asks them to speak louder. They also have complained that he incorrectly reads back their addresses even when they have enunciated clearly and spelled street names.

In this case, the employer has a reasonable belief, based on objective evidence, that Richard's ability to correctly process mail orders will be impaired by a medical condition (i.e., a problem with his hearing). The employer, therefore, may make disability-related inquiries of Richard or require him to submit to a medical examination to determine whether he can perform the essential functions of his job.

7. May an employer ask an employee for **documentation** when s/he requests a **reasonable accommodation?**

Yes. The employer is entitled to know that an employee has a covered disability that requires a reasonable accommodation.[(49)] Thus, when the **disability or the need for the accommodation is not known or obvious,** it is job-related and consistent with business necessity for an employer to ask an employee for reasonable documentation about his/her disability and its functional limitations that require reasonable accommodation.[(50)]

8. May an employer ask **all employees what prescription medications** they are taking?

Generally, no. Asking all employees about their use of prescription medications is not job-related and consistent with business necessity.[(51)] In limited circumstances, however, certain employers may be able to demonstrate that it *is* job-related and consistent with business necessity to require employees in positions affecting public safety to report when they are taking medication that may affect their ability to perform essential functions. **Under these limited circumstances, an employer must be able to demonstrate that an employee's inability or impaired ability to perform essential functions will result in a direct threat.** For example, a police department could require armed officers to report when they are taking medications that may affect their ability to use a firearm or to perform other essential functions of their job. Similarly, an airline could require its pilots to report when they are taking any medications that may impair their ability to fly. A fire department, however, could not require fire department employees who perform only administrative duties to report their use of medications because it is unlikely that it could show that these employees would pose a direct threat as a result of their inability or impaired ability to perform their essential job functions.

9. **What action may an employer take if an employee fails to respond to a disability-related inquiry or fails to submit to a medical examination** that is job-related and consistent with business necessity?

The action the employer may take depends on its reason for making the disability-related inquiry or requiring a medical examination.

> Example A: A supervisor notices that the quality of work from an ordinarily outstanding employee has deteriorated over the past several months. Specifically, the employee requires more time to complete routine reports, which frequently are submitted late and contain numerous errors. The supervisor also has observed during this period of time that the employee appears to be squinting to see her computer monitor, is holding printed material close to her face to read it, and takes frequent breaks during which she sometimes is seen rubbing her eyes. Concerned about the employee's declining performance, which appears to be due to a medical condition, the supervisor tells her to go see the company doctor, but she does not.
>
> Any discipline that the employer decides to impose should focus on the employee's **performance problems**. Thus, the employer may discipline the employee for past and future performance problems in accordance with a uniformly applied policy.
>
> Example B: An accountant with no known disability asks for an ergonomic chair because she says she is having back pain. The employer asks the employee to provide documentation from her treating physician that: (1) describes the nature, severity, and duration of her impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits her ability to perform the activity or activities; and (2) substantiates why an ergonomic chair is needed.
>
> Here, the employee's possible disability and **need for reasonable accommodation** are not obvious. Therefore, if the employee fails to provide the requested documentation or if

the documentation does not demonstrate the existence of a disability, the employer can refuse to provide the chair.[(52)]

## B. <u>Scope and Manner of Disability-Related Inquiries and Medical Examinations</u>

10. **What documentation** may an employer require from an employee who requests a **reasonable accommodation**?

An employer may require an employee to provide documentation that is **sufficient** to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested, but cannot ask for unrelated documentation. This means that, in most circumstances, an employer cannot ask for an employee's complete medical records because they are likely to contain information unrelated to the disability at issue and the need for accommodation.[(53)]

Documentation is sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed.

> Example: An employee, who has exhausted all of his available leave, telephones his supervisor on Monday morning to inform him that he had a severe pain episode on Saturday due to his sickle cell anemia, is in the hospital, and needs time off. Prior to this call, the supervisor was unaware of the employee's medical condition.
>
> The employer can ask the employee to send in documentation from his treating physician that substantiates that the employee has a disability, confirms that his hospitalization is related to his disability, and provides information on how long he may be absent from work. [(54)]

11. May an employer **require an employee to go to a health care professional of the employer's (rather than the employee's) choice** when the employee requests a **reasonable accommodation**?

The ADA does not prevent an employer from requiring an employee to go to an appropriate health care professional of the employer's choice if the employee provides **insufficient documentation** from his/her treating physician (or other health care professional) to substantiate that s/he has an ADA disability and needs a reasonable accommodation.[(55)] However, if an employee provides insufficient documentation in response to the employer's initial request, the employer should explain why the documentation is insufficient and allow the employee an opportunity to provide the missing information in a timely manner.[(56)] The employer also should consider consulting with the employee's doctor (with the employee's consent) before requiring the employee to go to a health care professional of its choice. [(57)]

**Documentation is insufficient** if it does not specify the existence of an ADA disability and explain the need for reasonable accommodation.[(58)] Documentation also might be insufficient where, for example: (1) the health care professional does not have the expertise to give an opinion about the employee's medical condition and the limitations imposed by it; (2) the information does not specify the functional limitations due to the disability; or, (3) other factors indicate that the information provided is not credible or is fraudulent. If an employee provides insufficient documentation, an employer does not have to provide reasonable accommodation until sufficient documentation is provided.

Any medical examination conducted by the employer's health care professional must be job-related and consistent with business necessity. This means that the examination must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation. If an employer requires an employee to go to a health care professional of the employer's choice, the

employer must pay all costs associated with the visit(s).[59]

The Commission has previously stated that when an employee provides sufficient evidence of the existence of a disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could be considered retaliation.[60] However, an employer that requests additional information or requires a medical examination based on a good faith belief that the documentation the employee submitted is insufficient would *not* be liable for retaliation.

12. May an employer require that an **employee, who it reasonably believes will pose a direct threat, be examined by an appropriate health care professional of the employer's choice?**

Yes. The determination that an employee poses a direct threat must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job. This assessment must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or best objective evidence.[61] To meet this burden, an employer may want to have the employee examined by a health care professional of its choice who has expertise in the employee's specific condition and can provide medical information that allows the employer to determine the effects of the condition on the employee's ability to perform his/her job. Any medical examination, however, must be limited to determining whether the employee can perform his/her job without posing a direct threat, with or without reasonable accommodation. An employer also must pay all costs associated with the employee's visit(s) to its health care professional.[62]

An employer should be cautious about relying solely on the opinion of its own health care professional that an employee poses a direct threat where that opinion is contradicted by documentation from the employee's own treating physician, who is knowledgeable about the employee's medical condition and job functions, and/or other objective evidence. In evaluating conflicting medical information, the employer may find it helpful to consider: (1) the area of expertise of each medical professional who has provided information; (2) the kind of information each person providing documentation has about the job's essential functions and the work environment in which they are performed; (3) whether a particular opinion is based on speculation or on current, objectively verifiable information about the risks associated with a particular condition; and, (4) whether the medical opinion is contradicted by information known to or observed by the employer (e.g., information about the employee's actual experience in the job in question or in previous similar jobs).

13. **How much** medical information can an employer obtain about an employee when it reasonably believes that an employee's **ability to perform the essential functions** of his/her job will be impaired by a medical condition or that s/he **will pose a direct threat** due to a medical condition?

An employer is entitled only to the information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. This means that, in most situations, an employer cannot request an employee's complete medical records because they are likely to contain information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat.

14. May an employer require an employee to provide **medical certification that s/he can safely perform a physical agility or physical fitness test**?

Yes. Employers that require physical agility or physical fitness tests may ask an employee to have a physician certify whether s/he can safely perform the test. [63] In this situation, however, the employer is entitled to obtain only **a note simply stating that the employee can safely perform the test or, alternatively, an explanation of the reason(s) why the employee cannot perform the test.** An employer may not obtain the employee's complete medical records or information about any conditions that do not affect the employee's ability to perform the physical agility or physical fitness test safely.

## C. Disability-Related Inquiries and Medical Examinations Relating to Leave[(64)]

15. May an employer request an employee to provide a **doctor's note or other explanation** to substantiate his/her use of sick leave?

Yes. An employer is entitled to know why an employee is requesting sick leave. An employer, therefore, may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, as long as it has a policy or practice of requiring all employees, with and without disabilities, to do so.

16. May an employer require **periodic updates** when an employee is on extended leave because of a medical condition?

Yes. If the employee's request for leave did not specify an exact or fairly specific return date (e.g., October 4 or around the second week of November) or if the employee needs continued leave beyond what was originally granted, the employer may require the employee to provide periodic updates on his/her condition and possible date of return.[(65)] However, where the employer has granted a fixed period of extended leave and the employee has not requested additional leave, the employer *cannot* require the employee to provide periodic updates. Employers, of course, may call employees on extended leave to check on their progress or to express concern for their health.

17. May an employer make disability-related inquiries or require a medical examination**when an employee who has been on leave for a medical condition seeks to return to work**?

Yes. If an employer has a reasonable belief that an employee's **present** ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, the employer may make disability-related inquiries or require the employee to submit to a medical examination. Any inquiries or examination, however, must be limited in scope to what is needed to make an assessment of the employee's ability to work. Usually, inquiries or examinations related to the specific medical condition for which the employee took leave will be all that is warranted. The employer may not use the employee's leave as a justification for making far-ranging disability-related inquiries or requiring an unrelated medical examination.

> Example A: A data entry clerk broke her leg while skiing and was out of work for four weeks, after which time she returned to work on crutches. In this case, the employer does not have a reasonable belief, based on objective evidence, either that the clerk's ability to perform her essential job functions will be impaired by a medical condition or that she will pose a direct threat due to a medical condition. The employer, therefore, may not make any disability-related inquiries or require a medical examination but generally may ask the clerk how she is doing and express concern about her injury.

> Example B: As the result of problems he was having with his medication, an employee with a known psychiatric disability threatened several of his co-workers and was disciplined. Shortly thereafter, he was hospitalized for six weeks for treatment related to the condition. Two days after his release, the employee returns to work with a note from his doctor indicating only that he is "cleared to return to work." Because the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat due to a medical condition, it may ask the employee for additional documentation regarding his medication(s) or treatment or request that he submit to a medical examination.

## D. Periodic Testing and Monitoring

In most instances, an employer's need to make disability-related inquiries or require medical examinations will be triggered by evidence of **current** performance problems or observable evidence suggesting that a particular employee will pose a direct threat. The following questions, however,

address situations in which disability-related inquiries and medical examinations of employees may be permissible absent such evidence.

18. May **employers** require **periodic medical examinations** of employees in **positions affecting public safety (e.g., police officers and firefighters)**?

Yes. In limited circumstances, periodic medical examinations of employees in positions affecting public safety that are narrowly tailored to address specific job-related concerns are permissible.[(66)]

> Example A: A fire department requires employees for whom firefighting is an essential job function to have a comprehensive visual examination every two years and to have an annual electrocardiogram because it is concerned that certain visual disorders and heart problems will affect their ability to do their job without posing a direct threat. These periodic medical examinations are permitted by the ADA.

> Example B: A police department may not periodically test all of its officers to determine whether they are HIV-positive because a diagnosis of that condition alone is not likely to result in an inability or impaired ability to perform essential functions that would result in a direct threat.

> Example C: A private security company may require its armed security officers who are expected to pursue and detain fleeing criminal suspects to have periodic blood pressure screenings and stress tests because it is concerned about the risk of harm to the public that could result if an officer has a sudden stroke.

If an employer decides to terminate or take other adverse action against an employee with a disability based on the results of a medical examination, it must demonstrate that the employee is unable to perform his/her essential job functions or, in fact, poses a direct threat that cannot be eliminated or reduced by reasonable accommodation.[(67)] Therefore, when an employer discovers that an employee has a condition for which it lawfully may test as part of a periodic medical examination, it may make additional inquiries or require additional medical examinations that are **necessary to determine whether the employee currently is unable to perform his/her essential job functions or poses a direct threat due to the condition.**

19. May an employer subject an employee, who has been off from work in an alcohol rehabilitation program, to **periodic alcohol testing** when s/he returns to work?

Yes, but only if the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat in the absence of periodic testing. Such a reasonable belief requires an individualized assessment of the employee and his/her position and cannot be based on general assumptions. Employers also may conduct periodic alcohol testing pursuant to "last chance" agreements.[(68)]

In determining whether to subject an employee to periodic alcohol testing (in the absence of a "last chance" agreement), the employer should consider the safety risks associated with the position the employee holds, the consequences of the employee's inability or impaired ability to perform his/her job functions, and how recently the event(s) occurred that cause the employer to believe that the employee will pose a direct threat (e.g., how long the individual has been an employee, when s/he completed rehabilitation, whether s/he previously has relapsed). Further, the duration and frequency of the testing must be designed to address particular safety concerns and should not be used to harass, intimidate, or retaliate against the employee because of his/her disability. Where the employee repeatedly has tested negative for alcohol, continued testing may not be job-related and consistent with business necessity because the employer no longer may have a *reasonable* belief that the employee will pose a direct threat.

**Example A:** Three months after being hired, a city bus driver informed his supervisor of his alcoholism and requested leave to enroll in a rehabilitation program. The driver explained that he had not had a drink in more than 10 years until he recently started having a couple of beers before bed to deal with the recent separation from his wife. After four months of rehabilitation and counseling, the driver was cleared to return to work. Given the safety risks associated with the bus driver's position, his short period of employment, and recent completion of rehabilitation, the city can show that it would be job-related and consistent with business necessity to subject the driver to frequent periodic alcohol tests following his return to work.

**Example B:** An attorney has been off from work in a residential alcohol treatment program for six weeks and has been cleared to return to work. Her supervisor wants to perform periodic alcohol tests to determine whether the attorney has resumed drinking. Assuming that there is no evidence that the attorney will pose a direct threat, the employer cannot show that periodic alcohol testing would be job-related and consistent with business necessity.[69]

# OTHER ACCEPTABLE DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES

20. May an **Employee Assistance Program (EAP)**[70] **counselor** ask an employee seeking help for personal problems about any physical or mental condition(s) s/he may have?

Yes. An EAP counselor may ask employees about their medical condition(s) if s/he: (1) does not act for or on behalf of the employer; (2) is obligated to shield any information the employee reveals from decision makers; and, (3) has no power to affect employment decisions. Many employers contract with EAP counselors so that employees can voluntarily and confidentially seek professional counseling for personal or work-related problems without having to be concerned that their employment status will be affected because they sought help.[71]

21. May an employer make disability-related inquiries and require medical examinations that are required or necessitated by another **federal law or regulation**?

Yes. An employer may make disability-related inquiries and require employees to submit to medical examinations that are mandated or necessitated by another federal law or regulation.[72] For example, under federal safety regulations, interstate bus and truck drivers must undergo medical examinations at least once every two years. Similarly, airline pilots and flight attendants must continually meet certain medical requirements.[73] Other federal laws that require medical examinations or medical inquiries of employees without violating the ADA include:

- the Occupational Safety and Health Act;[74]

- the Federal Mine Health and Safety Act;[75] and

- other federal statutes that require employees exposed to toxic or hazardous substances to be medically monitored at specific intervals.[76]

22. May an employer make disability-related inquiries or conduct medical examinations that are part of its **voluntary wellness program**?

Yes. The ADA allows employers to conduct voluntary medical examinations and activities, including voluntary medical histories, which are part of an employee health program without having to show that they are job-related and consistent with business necessity, as long as any medical records acquired as part of the wellness program are kept confidential and separate from personnel records.[77] These

programs often include blood pressure screening, cholesterol testing, glaucoma testing, and cancer detection screening. Employees may be asked disability-related questions and may be given medical examinations pursuant to such voluntary wellness programs.[78]

A **wellness program is "voluntary"** as long as an employer neither requires participation nor penalizes employees who do not participate.

23. May an employer ask employees to **voluntarily self-identify as persons with disabilities for affirmative action purposes?**

Yes. An employer may ask employees to voluntarily self-identify as individuals with disabilities when the employer is:

- undertaking affirmative action because of a federal, state, or local law (including a veterans' preference law) that requires affirmative action for individuals with disabilities (i.e., the law requires some action to be taken on behalf of such individuals); or,

- *voluntarily* using the information to benefit individuals with disabilities.[79]

If an employer invites employees to voluntarily self-identify in connection with the above-mentioned situations, the employer must indicate clearly and conspicuously on any written questionnaire used for this purpose, or state clearly (if no written questionnaire is used), that: (1) the specific information requested is intended for use solely in connection with its affirmative action obligations or its voluntary affirmative action efforts; and, (2) the specific information is being requested on a voluntary basis, that it will be kept confidential in accordance with the ADA, that refusal to provide it will not subject the employee to any adverse treatment, and that it will be used only in accordance with the ADA.[80]

In order to invite self-identification for purposes of an affirmative action program that is voluntarily undertaken or undertaken pursuant to a law that encourages (rather than requires) affirmative action, an employer must be taking some action that actually benefits individuals with disabilities. The invitation to self-identify also must be *necessary* in order to provide the benefit.

# INDEX

*Note: Page numbering and references removed for on-line version.*

Affirmative action

Airline pilots

Alcohol testing

Application for new job

Centers for Disease Control

Confidentiality

Direct threat

Disability-related inquiry, defined

Documentation

conflicting

insufficient

requests for reasonable accommodation

Employee Assistance Program (EAP)

Employee, defined

Employer's doctor

Failure to respond to disability-related inquiry

Failure to submit to medical examination

Family and Medical Leave Act (FMLA)

Firefighters

Genetic information

HIV

Illegal use of drugs

Information from another person

Job-related and consistent with business necessity, defined

Medical certification

Medical examination, defined

Performance problems

Periodic medical examinations

Periodic updates

Police officers

Pregnancy

Prescription drugs and medications

Procedures and tests

blood analyses

blood pressure screening

breath analyses

cholesterol testing

diagnostic procedures

hair analyses

nerve conduction tests

physical agility tests

physical fitness tests

polygraph examinations

psychological tests

pulmonary function tests

range-of-motion tests

saliva analyses

urine analyses

vision tests

Public safety positions

Reasonable accommodation

Return to work

Sick leave

Voluntary self-identification

Voluntary wellness program

Workers' compensation

---

1. 42 U.S.C. §§ 12101-12117, 12201-12213 (1994)(codified as amended).

2. Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations Under the Americans with Disabilities Act of 1990, 8 FEP Manual (BNA) 405:7191 (1995) [hereinafter Preemployment Questions and Medical Examinations]. This and other ADA guidances are available through the Internet at http://www.eeoc.gov.

3. Pursuant to the Rehabilitation Act Amendment of 1992, the ADA's employment standards apply to all nonaffirmative action employment discrimination claims of individuals with disabilities who are federal

employees or applicants for federal employment. Pub. L. No. 102-569 §503(b), 106 Stat. 4344, 4424 (1992) (codified as amended at 29 U.S.C. §791(g)(1994)). Accordingly, the analysis in the guidance applies to federal sector complaints of nonaffirmative action employment discrimination arising under section 501 of the Rehabilitation Act of 1973. It also applies to complaints of nonaffirmative action employment discrimination arising under section 503 and to employment discrimination under section 504 of the Rehabilitation Act. Id. at §§793 (d), 794(d)(1994).

4. The purpose of this guidance is to explain when it is permissible for an employer to make a disability-related inquiry or require a medical examination of an employee. It does not focus on what actions an employer may take based on what it learns in response to such an inquiry or after it receives the result of a medical examination.

5. In the ADA legislative history, Congress stated that an employee's "actual performance on the job is, of course, the best measure of ability to do the job." S. Rep. No. 101-116, at 39 (1989); H.R. Rep. No. 101-485, pt. 2, at 75 (1990).

6. However, where an applicant has an obvious disability, and the employer has a reasonable belief that s/he will need a reasonable accommodation to perform specific job functions, the employer may ask whether the applicant needs a reasonable accommodation and, if so, what type of accommodation. These same two questions may be asked when an individual voluntarily discloses a nonvisible disability or voluntarily tells the employer that s/he will need a reasonable accommodation to perform a job. 42 U.S.C. §12112(c)(B)(1994); 29 C.F.R. §1630.13(a)(1998); see also Preemployment Questions and Medical Examinations, supra note 2, at 6-8, 8 FEP at 405:7193-94; EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities at 13-15, 8 FEP Manual (BNA) 405:7461, 7467-68 (1997)[hereinafter The ADA and Psychiatric Disabilities]; Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act at 20-21, 8 FEP Manual (BNA) 405:7601, 7611(1999)[hereinafter Reasonable Accommodation Under the ADA]. Under certain circumstances, an employer also may ask applicants to self-identify as individuals with disabilities for purposes of its affirmative action program. See Preemployment Questions and Medical Examinations, supra note 2, at 12-13, 8 FEP at 405:7196-97.

7. 42 U.S.C. §12112(d)(3)(1994); 29 C.F.R. §1630.14(b)(1998). However, if an individual is screened out because of a disability, the employer must show that the exclusionary criterion is job-related and consistent with business necessity. 42 U.S.C. §12112(b)(6)(1994); 29 C.F.R. §§1630.10, 1630.14(b)(3) (1998).

8.  42 U.S.C. §12112(d)(4)(A)(1994); 29 C.F.R. §1630.14(c)(1998).

9. See infra note 77.

10. 42 U.S.C. §§12112(d)(3)(B), (4)(C)(1994); 29 C.F.R. §1630.14(b)(1)(1998). The Commission also has interpreted the ADA to allow employers to disclose medical information to state workers' compensation offices, state second injury funds, workers' compensation insurance carriers, and to health care professionals when seeking advice in making reasonable accommodation determinations. 29 C.F.R. pt. 1630, app. §1630.14(b)(1998). Employers also may use medical information for insurance purposes. Id. See also Preemployment Questions and Medical Examinations, supra note 2, at 21-23, 8 FEP at 405:7201; EEOC Enforcement Guidance: Workers' Compensation and the ADA at 7, 8 FEP Manual (BNA) 405:7391, 7394 (1996)[hereinafter Workers' Compensation and the ADA].

11. "Covered entity" means an employer, employment agency, labor organization, or joint labor management committee. 29 C.F.R. §1630.2(b)(1998). For simplicity, this guidance refers to all covered entities as "employers." The definition of "employer" includes persons who are "agents" of the employer, such as managers, supervisors, or others who act for the employer (e.g., agencies used to conduct background checks on applicants and employees). 42 U.S.C. §12111(5)(1994).

12. 42 U.S.C. §12112(d)(4)(A)(1994); 29 C.F.R. §1630.14(c)(1998). See infra Question 5 and

accompanying text for a discussion of what the "job-related and consistent with business necessity" standard means.

13. See e.g., 42 U.S.C. §12112(a)(1994)(no entity shall discriminate against a qualified individual with a disability because of the disability of such individual).

14. Congress was particularly concerned about questions that allowed employers to learn which employees have disabilities that are not apparent from observation. It concluded that the only way to protect employees with nonvisible disabilities is to prohibit employers from making disability-related inquiries and requiring medical examinations that are not job-related and consistent with business necessity. See S. Rep. No. 101-116 at 39-40 (1989); H.R. Rep. No. 101-485, pt. 2, at 75 (1990) ("An inquiry or medical examination that is not job-related serves no legitimate employer purpose, but simply serves to stigmatize the person with a disability." A person with cancer "may object merely to being identified, independent of the consequences [since] being identified as [a person with a disability] often carries both blatant and subtle stigma").

15. See Roe v. Cheyenne Mountain Resort, 124 F.3d 1221, 1229, 7 AD Cas. (BNA) 779, 783 (10th Cir. 1997)("it makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability"). Although Roe involved only the issue of disability-related inquiries of employees, the same rationale applies to medical examinations of employees and to disability-related inquiries and medical examinations of applicants. The ADA's restrictions on disability-related inquiries and medical examinations apply to individuals both with and without disabilities at all three stages: pre-offer, post-offer, and during employment. See also Griffin v. Steeltek ,Inc., 160 F.3d 591, 595, 8 AD Cas.1249, 1252 (10th Cir. 1998), cert. denied, 119 S.Ct. 1455, 9 AD Cas. 416 (1999)(a job applicant without a disability can sue under the ADA regarding medical history questions); Gonzales v. Sandoval County, 2 F.Supp. 2d 1442, 1445, 8 AD Cas.1337, 1340 (D. N.M. 1998)(plaintiff need not establish disability to state a claim for a prohibited inquiry under the ADA); Fredenburg v. Contra Costa County Department of Health Services, 172 F.3d 1176, 9 AD Cas. 385 (9th Cir. 1999)(requiring plaintiffs to prove that they are persons with disabilities to challenge a medical examination would render §12112(d)(4)(A) of the ADA "nugatory"; thus, plaintiffs need not prove that they are qualified individuals with a disability to bring claims challenging the scope of medical examinations under the ADA).

Some courts, however, have held that to bring a claim alleging a violation of the ADA's prohibition against disability-related inquiries and medical examinations, an individual must demonstrate that s/he is a qualified individual with a disability. See e.g., Armstrong v. Turner Industries, Inc., 141 F.3d 554, 558, 8 AD Cas. (BNA) 118, 124 (5th Cir. 1998), aff'g 950 F. Supp. 162, 7 AD Cas. 875 (M.D. La. 1996) (plaintiff must be a qualified individual with a disability to challenge an illegal preemployment inquiry); Hunter v. Habegger Corp., 139 F.3d 901(7th Cir. 1998)("it seems clear that in order to assert that one has been discriminated against because of an improper inquiry, that person must also have been otherwise qualified"). For the reasons stated above, it is the Commission's position that the plain language of the statute explicitly protects individuals with and without disabilities from improper disability-related inquiries and medical examinations.

16. For example, employers may make disability-related inquiries and require medical examinations that are required or necessitated by another federal law or regulation. See infra Question 21 and accompanying text. Employers also may make disability-related inquiries and conduct medical examinations that are part of their voluntary wellness programs. See infra Question 22 and accompanying text.

17. Preemployment Questions and Medical Examinations, supra note 2, at 4-13, 8 FEP at 405:7191, 7192-97.

18. Id. at 4, 8 FEP at 405:7192.

19. Id. at 4-13, 8 FEP at 405:7192-97.

20. The prohibition against making disability-related inquiries applies to inquiries made directly to an employee, as well as to indirect or surreptitious inquiries such as a search through an employee's belongings to confirm an employer's suspicions about an employee's medical condition. See Doe v. Kohn Nast & Graf, P.C., 866 F. Supp. 190, 3 AD Cas. (BNA) 1322 (E.D. Pa. 1994) (employer conducted an unlawful medical inquiry when it searched the office of an employee it knew was sick and discovered a letter indicating the employee had AIDS).

21. As used in this guidance, the term "genetic information" has the same definition as "protected genetic information" in Executive Order 13145. In general, genetic information is information about an individual's genetic tests, information about the genetic tests of an individual's family members, or information about the occurrence of a disease, medical condition, or disorder in family members of the individual. See Exec. Order No. 13,145, To Prohibit Discrimination in Federal Employment Based on Genetic Information, 65 Fed. Reg. 6877 (Feb. 8, 2000).

22. See Griffin v. Steeltek, Inc., 160 F.3d 591, 594, 8 AD Cas. (BNA) 1249, 1252 (10th Cir. 1998), cert. denied, 119 S.Ct. 1455, 9 AD. Cas. 416 (1999) (on its application for employment, employer unlawfully asked: "Have you received workers' compensation or disability payments? If yes, describe.").

23. See Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 7 AD Cas. (BNA) 779 (10th Cir. 1997)(employer had a policy of requiring all employees to report every drug, including legal prescription drugs); Krocka v. Bransfield, 969 F. Supp. 1073 (N.D. Ill. 1997)(police department implemented a policy of monitoring employees taking psychotropic medication).

24. Preemployment Questions and Medical Examinations, supra note 2, at 9, 8 FEP at 405:7195.

25. Preemployment Questions and Medical Examinations, supra note 2, at 9, 8 FEP at 405:7195.

26. Employers also may maintain and enforce rules prohibiting employees from being under the influence of alcohol in the workplace and may conduct alcohol testing for this purpose if they have a reasonable belief that an employee may be under the influence of alcohol at work.

27. An individual who currently uses drugs illegally is not protected under the ADA; therefore, questions about current illegal drug use are not disability-related inquiries. 42 U.S.C. §12114(a)(1994); 29 C.F.R. §1630.3(a)(1998). However, questions about past addiction to illegal drugs or questions about whether an employee ever has participated in a rehabilitation program are disability-related because past drug addiction generally is a disability. Individuals who were addicted to drugs, but are not currently using drugs illegally, are protected under the ADA. 29 C.F.R. §1630.3(b)(1),(2)(1998).

28. Pregnancy is not a disability for purposes of the ADA. 29 C.F.R. pt. 1630, app. §1630.2(h)(1998). However, discrimination on that basis may violate the Pregnancy Discrimination Act amendments to Title VII. 42 U.S.C. §2000e(k)(1994).

29. Preemployment Questions and Medical Examinations supra note 2, at 14, 8 FEP at 405:7197.

30. Id.

31. See supra note 26.

32. See supra note 27.

33. Under the ADA, polygraph examinations, which purportedly measure whether a person believes s/he is telling the truth in response to a particular inquiry, are not medical examinations. However, an employer cannot ask disability-related questions as part of the examination. See Preemployment

Questions and Medical Examinations, supra note 2, at 17, 8 FEP at 405:7199.

34. 42 U.S.C. §12111(4)(1994); 29 C.F.R. §1630.2(f)(1998). This term has the same meaning as it does under Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000e(f)(1994).

35. In its guidance on contingent workers, the Commission lists additional factors that indicate when a worker is an employee and explains that other aspects of the relationship between the parties may affect the determination of whether an employee-employer relationship exists. See EEOC Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms at 4-7, 8 FEP Manual (BNA) 405:7551, 7554-55 (1997).

36. An employee in this situation is an applicant with respect to rules concerning disability-related inquiries and medical examinations but not for employee benefits (e.g., retirement, health and life insurance, leave accrual) or other purposes.

37. Where the employer already has medical information concerning an individual at the pre-offer stage for the new position (e.g., information obtained in connection with the individual's request for reasonable accommodation in his/her current position) and this information causes the employer to have a reasonable belief that the individual will need a reasonable accommodation to perform the functions of the new job, the employer may ask what type of reasonable accommodation would be needed to perform the functions of the new job, before extending an offer for that job. An employer, however, may not use its knowledge of an applicant's disability to discriminate against him/her. The employer also may not use the fact that the individual will need a reasonable accommodation in the new position to deny him/her the new job unless it can show that providing the accommodation would cause an undue hardship.

38. 42 U.S.C. §12112(d)(3)(1994); 29 C.F.R. §1630.14(b)(1998).

39. "Direct threat" means a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodation. 29 C.F.R. §1630.2(r)(1998). Direct threat determinations must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job, considering a reasonable medical judgment relying on the most current medical knowledge and/or best available objective evidence. Id. To determine whether an employee poses a direct threat, the following factors should be considered: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and, (4) the imminence of the potential harm. Id.

40. The Commission explained this standard in its enforcement guidance on The ADA and Psychiatric Disabilities, supra note 6, at 15, 8 FEP at 405:7468-69.

41. See infra Questions 18 and 19 and accompanying text.

42. See infra Question 6 and accompanying text.

43. See Yin v. State of California, 95 F.3d 864, 868, 5 AD Cas. (BNA) 1487, 1489 (9th Cir. 1996)(where employee missed an inordinate number of days and her performance declined, employer's request that she submit to a medical examination was job-related and consistent with business necessity).

44. See also infra Question 12.

45. 42 U.S.C. §12113 (d)(1994).

46. The most current list was published by HHS, Centers for Disease Control and Prevention (CDC), in 1998. 63 Fed.Reg. 49359 (Sept. 15, 1998).

47. But see EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1097, 8 AD Cas. (BNA) 401, 408 (6th Cir. 1998) (employer did not violate the ADA when it required a produce clerk, who claimed to be HIV-positive, to submit to a medical examination to determine whether he posed a direct threat). The Commission believes that Prevo's was wrongly decided because the employer did not base its belief that the employee posed a direct threat on reasonably available objective evidence and, therefore, its request that the employee submit to a medical examination was not job-related and consistent with business necessity. A number of sources, such as the Centers for Disease Control (www.cdc.gov), a physician or health care provider knowledgeable about HIV and other infectious diseases, a state or local health department, a public or university library, or a state or county medical association can provide information about the likelihood of an employee transmitting HIV or other infectious diseases to co-workers or the public.

48. This guidance does not affect the obligation of a physician, under any state law, to report cases of active tuberculosis to appropriate public health authorities.

49. See Reasonable Accommodation Under the ADA, supra note 6, at 14-15, 8 FEP at 405:7608 for examples of other situations where employers may ask for documentation; see also id. at 16-17, 8 FEP at 405: 7609 for examples of situations in which an employer **cannot** ask for documentation in response to a request for reasonable accommodation.

50. 29 C.F.R. pt. 1630 app. §1630.9 (1998); see also Preemployment Questions and Medical Examinations, supra note 2, at 6, 8 FEP at 405: 7193; ADA and Psychiatric Disabilities, supra note 6, at 22-23, 8 FEP at 405:7472-73; Reasonable Accommodation Under the ADA, supra note 6, at 12-13, 8 FEP at 405: 7607. See also Templeton v. Neodata Services, Inc., 162 F.3d 617, 618, 8 AD Cas. (BNA) 1615, 1616 (10th Cir. 1998)(employer's request for updated medical information was reasonable in light of treating physician's letter indicating doubt as to employee's ability to return to work as scheduled, and employer needed the requested information to determine appropriate reasonable accommodation for employee in event she was able to return to work).

51. See Roe v. Cheyenne Mountain Conference Resort, 124 F.3d 1221, 1229, 7 AD Cas. (BNA) 779, 784 (10th Cir. 1997) (employer, who implemented a drug and alcohol policy that included many permissible inquiries but also asked employees to inform the employer of every drug they were taking, including legal prescription drugs, violated the ADA by failing to demonstrate that this inquiry was job-related and consistent with business necessity).

52. See Reasonable Accommodation Under the ADA, supra note 6, at 15, 8 FEP at 405:7608.

53. See id. at 13, 8 FEP at 405:7607. (An "employer may require only the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation." If an employee has more than one disability, an employer can request information pertaining only to the disability for which the employee is requesting an accommodation.)

54. See Reasonable Accommodation Under the ADA, supra note 6, at 14-15, 16-17, 8 FEP at 405:7607-09. If the employee subsequently should request another reasonable accommodation related to his sickle cell anemia, the employer may ask for reasonable documentation relating to the new request (if the need is not obvious). The employer, however, cannot ask again for documentation that the employee has an ADA disability where the medical information the employee provided in support of his first reasonable accommodation request established the existence of a long-term impairment that substantially limits a major life activity. Id. at 16-17, 8 FEP at 405: 7609.

55. See Reasonable Accommodation Under the ADA, supra note 6, at 15-16, 8 FEP at 405:7698; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

56. See Reasonable Accommodation Under the ADA, supra note 6, at 15, 8 FEP at 405:7608.

57. Since a doctor cannot disclose information about a patient without his/her permission, an employer must obtain a release from the employee that will permit the doctor to answer questions. The release should be clear as to what information will be requested. See Reasonable Accommodation Under the ADA, supra note 6, at 13-14, 8 FEP at 405:7607.

58. Id. at 15, 8 FEP at 405:7608-09.

59. Id. at 16, 8 FEP at 405:7609; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

60. See Reasonable Accommodation Under the ADA, supra note 6, at 15 (n.30), 8 FEP at 405:7609.

61. 29 C.F.R. §1630.2(r)(1998).

62. See Reasonable Accommodation Under the ADA, supra note 6, at 16, 8 FEP at 405:7609; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

63. See Preemployment Questions and Medical Examinations, supra note 2, at 16, 8 FEP at 405:7198.

64. The questions and answers in this section address situations in which an employee has used sick, annual, or some other kind of leave because of a medical condition, but has **not** taken leave under the **Family and Medical Leave Act (FMLA)**. 29 U.S.C. §2601(1994). Where an employee has been on leave under the FMLA, the employer must comply with the requirements of that statute. For example, the FMLA generally does not authorize an employer to make its own determination of whether an employee is fit to return to work but, rather, states that the employer must rely on the evaluation done by the employee's own health care provider. Id. at §2613(b).

65. See Reasonable Accommodation Under the ADA, supra note 6, at 57, 8 FEP at 405:7632.

66. See The ADA and Psychiatric Disabilities, supra note 6, at 16 (n.41), 8 FEP at 405:7469.

67. See supra note 39.

68. Some employers, including some federal government agencies, commonly use "last chance agreements" in disciplinary actions involving employee use of alcohol. Such agreements typically provide that, as a condition of continued employment, employees must enter into a rehabilitation program and submit to periodic alcohol testing.

69. The employer, however, may require the attorney to submit to an alcohol test if it has objective evidence that she is violating a workplace policy prohibiting all employees from being under the influence of alcohol on the job. See supra note 26.

70. Generally, EAPs are confidential programs designed to assist employees in coping with personal issues (e.g., substance abuse, grief) that may interfere with their job performance.

71. See Vardiman v. Ford Motor Co., 981 F. Supp. 1279, 1283, 7 AD Cas. (BNA) 1068, 1072 (E.D. Mo. 1997)(EAP representative had no power to affect employment decisions and, in fact, was obligated to shield the decision makers from an employee's personal or substance abuse problems).

72. 29 C.F.R. 1630.15(e)(1998)("it may be a defense to a charge of discrimination . . . that a challenged action is required or necessitated by another Federal law or regulation . . . .").

73. See e.g., 14 C.F.R. pt. 67(1999)(Federal Aviation Administration (FAA) and Department of Transportation (DOT) medical certifications); 14 C.F.R. pt. 121, app. I (1999)(FAA and DOT drug testing program); 49 C.F.R. pt. 40 and app. (1999)(procedures for transportation workplace drug testing

programs); 49 C.F.R. 240.207(1996)(Federal Railroad Administration and DOT procedures for making determination on hearing and visual acuity); 49 C.F.R. pt. 391(1999)(Federal Highway Administration and DOT medical certification requirements); 49 C.F.R. pt. 653(1999)(Federal Transit Administration (FTA) procedures for prevention of prohibited drug use in transit operations); 49 C.F.R. pt. 654(1999) (FTA procedures for prevention of alcohol abuse in transit operations).

74. 29 U.S.C. §§651-678 (1994).

75. 30 U.S.C. §§801-962 (1994).

76. See e.g., The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601(1994).

77. See H.R. Rep. No. 101-485, pt. 2, at 75 (1990) ("As long as the programs are voluntary and the medical records are maintained in a confidential manner and not used for the purpose of limiting health insurance eligibility or preventing occupational advancement, these activities would fall within the purview of accepted activities.").

78. If a program simply promotes a healthier life style but does not ask any disability-related questions or require medical examinations (e.g., a smoking cessation program that is available to anyone who smokes and only asks participants to disclose how much they smoke), it is not subject to the ADA's requirements concerning disability-related inquiries and medical examinations.

79. See Preemployment Questions and Medical Examinations, supra note 2, at 12, 8 FEP at 405:7196-97.

80. Id.

This page was last modified on March 24, 2005.

 Return to Home Page