# EXHIBIT 9

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

EMILY C. KROLL,

    Plaintiff,

-vs-                                    File No. 1:09-CV-626

WHITE LAKE AMBULANCE AUTHORITY,   HON. GORDON J. QUIST

    Defendant.
_____/

DEPOSITION OF BRIAN BINNS

Taken by the Plaintiff on the 9th day of March 2010, at the offices of Plunkett Cooney, 333 Bridge Street, NW, Suite 530, Grand Rapids, Michigan, at 9:16 a.m.

APPEARANCES:

For the Plaintiff:    Mr. Bradley K. Glazier (P-35523)
                       Bos & Glazier, PLC
                       990 Monroe Avenue, NW
                       Grand Rapids, Michigan 49503
                       (616) 458-6814
                       bglazier@bosglazier.com

For the Defendant:    Mr. Robert A. Callahan (P-47600)
                       Plunkett Cooney
                       950 Trade Centre Way, Suite 310
                       Kalamazoo, Michgan 49002
                       (269) 3882-5935
                       rcallahan@plunkettcooney.com

Also Present:         Ms. Jean Dresen

REPORTED BY:          Carrie S. Clark-Berry (CSR-4402)
                       Certified Shorthand Reporter
                       Registered Professional Reporter

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan 49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com   ©

Case 1:09-cv-00626-GJQ  ECF No. 52-4,  PageID.480  Filed 07/07/10  Page 3 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority

7

### Page 22

```
1   A   Absolutely.
2   Q   But you have not been successful in finding new employment?
3   A   No.
4   Q   And, of course, you need to work within those restrictions
5       that we talked about before?
6   A   Uh-huh. Yes.
7   Q   What was your employment before you were hired at White
8       Lake Ambulance Authority?
9   A   My employment began in 1971 as a volunteer, part paid
10      ambulance attendant. I then became a licensed -- State
11      licensed EMT, which remained part time. On April 2, 1985 I
12      became the first full-time employee of White Lake Ambulance
13      as a paramedic and Director.
14  Q   Do you remember the month and day of your first employment
15      with White Lake Ambulance Authority in '85?
16  A   Oh, yeah. I thought I said that, April 2, 1985. Sorry.
17  Q   You may have and I just didn't get it.
18  A   Sorry.
19  Q   What's your date of birth?
20  A   5/29/48.
21  Q   Which makes you how old?
22  A   Sixty-one.
23  Q   Where did you attend high school?
24  A   Whitehall High School.
25  Q   What year did you graduate?
```

### Page 23

```
1   A   1966.
2   Q   Did you attend any college courses?
3   A   Muskegon Community College. I was working on an Associate.
4       I think I'm about five credits short of an Associate.
5   Q   What type of an Associate's degree were you --
6   A   I was interested in health care.
7   Q   Did they have a licensure program for paramedics back in
8       this time frame of late '70s -- or early '70s, I guess.
9   A   Mid '80s is when the paramedic licensure began in the state
10      of Michigan.
11  Q   Did you have any sort of certificate when you first started
12      working as a part-time ambulance attendant?
13  A   I had American Red Cross advanced first aid and CPR. That
14      was the only State requirement for -- when I first started.
15      But then I became a licensed EMT. We had a pilot program
16      in the City of Whitehall sponsored by Michigan State
17      University, and I completed that and passed that and passed
18      the State exam. And then I went to Grand Valley for my
19      paramedic program and passed that and passed the license.
20  Q   When did you attend the Grand Valley program?
21  A   It was in the -- I'm going to say I graduated from that
22      certificate in 1976, I believe.
23  Q   Do you know how long the course of study was for that?
24  A   I think the course of study back then was 13 weeks. It's
25      currently over two years now.
```

### Page 24

```
1   Q   You indicated that you were the first full-time employee at
2       the White Lake Ambulance Authority starting on April 2nd of
3       1985, correct?
4   A   Correct.
5   Q   Was the White Lake Ambulance Authority created right around
6       that same time?
7   A   It was created as a government unit back on January 1st of
8       1968.
9   Q   So I take it they would have just had some part-time
10      employees from 1968 until 1985?
11  A   Correct.
12  Q   How many other employees worked there on a part-time basis
13      when you were hired in as the first full-time employee and
14      Director in April of 1985?
15  A   It varied because people were going to college for other
16      things, but I would say anywhere from 25 to 30.
17  Q   And what municipalities made up the White Lake Ambulance
18      Authority back then?
19  A   City of Whitehall, City of Montague, Blue Lake Township,
20      White Lake Township, Whitehall Township. I'm not sure if I
21      mentioned that one.
22  Q   You mentioned Whitehall.
23  A   Okay. City of Whitehall. Whitehall Township was also a
24      government unit, and then Montague Township.
25  Q   Has that changed over time in terms of the municipalities
```

### Page 25

```
1       that make up the Authority?
2   A   I'm glad you asked that, because Blue Lake Township
3       initially wasn't one of the original members. Blue Lake
4       Township came in in the mid '70s, I'd say. And that's a
5       guess on my part.
6   Q   Who makes up the Authority currently, if you know?
7   A   The same ones that I have mentioned.
8   Q   The same ones. And do all of the municipalities have Board
9       representation on the White Lake Ambulance Authority?
10  A   Yes.
11  Q   How many officials from each municipality?
12  A   One.
13  Q   At the time of your termination how many Board members were
14      there?
15  A   There were seven, but when it came time to vote to
16      terminate me there were only six in attendance. One was
17      absent. I've got to stand up. I hope you don't mind.
18          MR. GLAZZIER: Why don't we take just a short
19      comfort break right now and we'll resume in a few minutes.
20          MR. CALLAHAN: Okay.
21          (At 9:56 a.m. until 10:01 a.m., a recess was
22      taken.)
23  Q   Mr. Binns, who were the members of the Board at the time of
24      your termination?
25  A   Donald Studaven was the Chairman from Blue Lake Township.
```

(Pages 22 to 25)

Case 1:09-cv-00626-GJQ   ECF No. 52-4, PageID.481   Filed 07/07/10   Page 4 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
10

**Page 34**

1  of time that you were the Director of the Authority; is
2  that right?
3  A  Yes. And that was written by Mr. Fielstra and approved by
4  the Board.
5  Q  So it looks like what you're telling employees through the
6  distribution of this manual is that here's a list of things
7  that you should not be doing, and if you do engage in this
8  conduct you will receive discipline for doing so; is that
9  right?
10 A  Correct.
11       MR. CALLAHAN: Objection, form and foundation.
12    It doesn't incorporate all the policy handbook, which might
13    have different language in there.
14 Q  And the manual indicates that you will take into account
15    certain things in deciding the nature of the discipline
16    that will be imposed against the employee, correct?
17 A  Correct.
18 Q  Some things -- strike that.
19       Let me direct your attention to Page 17 of the
20    manual. Do you see Paragraph B?
21 A  Uh-huh.
22 Q  Is that a yes?
23 A  Yes. I'm sorry. Yes.
24 Q  And this is labeled Disciplinary Action, and it says
25    "Employees will be immediately terminated for refusing to

**Page 35**

1  submit to any agency requested drug or alcohol test.
2  Employees will also be subject to immediate termination for
3  first offense in any of the following situations, except
4  under the most extenuating circumstances." And then
5  there's a list of four things that could potentially result
6  in immediate termination; is that right?
7  A  Correct.
8  Q  One being drinking alcoholic beverages during working
9  hours, right?
10 A  Correct.
11 Q  Working or reporting to work -- reporting for duty impaired
12    by drugs or intoxicants, right?
13 A  Correct.
14 Q  A blood or chemical test that showed the presence of drug
15    or alcohol in the employee's system, right?
16 A  Correct.
17 Q  Or possession, concealment, promotion or sale of any
18    prohibited substances, including alcoholic beverages while
19    on duty; is that right?
20 A  Correct.
21 Q  Do you know why it is that on Paragraph 17 there is
22    reference to disciplinary action for this drug and alcohol
23    use and on Page 7 there is also a reference on item number
24    28 to the possession of alcohol or controlled substances
25    also being listed as an offense that could result in

**Page 36**

1  discipline?
2  A  You caught something that neither I or my Board or my
3  attorney caught.
4  Q  So I take it the answer to my question is you don't know
5  why it is that there's this sort of duplication?
6  A  Correct.
7  Q  I take it that there were occasions when you did take
8  disciplinary action in the form of a verbal reprimands --
9  A  Yes.
10 Q  -- against employees at the White Lake Ambulance Authority?
11 A  Yes. In fact, the majority of my disciplinary action was a
12    verbal reprimand.
13 Q  Did you ever verbally reprimand an employee and indicate to
14    that employee that the verbal reprimand would be
15    memorialized somehow? That there would be a record made of
16    the fact that the employee had received a verbal reprimand?
17 A  I never verbalized that, nor did I ever keep a record to
18    that extent.
19 Q  So when you would verbally reprimand an employee you would
20    just tell the employee that they were being verbally
21    reprimanded, or would you not even use that terminology?
22 A  I would say that you violated a work rule, you should know
23    better, it could affect your ability to treat a patient
24    properly, and I don't want to see it done again.
25 Q  Is there any reason why that verbal reprimand wasn't

**Page 37**

1  memorialized somehow?
2  A  A lot of times it was what I would consider a minor
3  violation. I would -- at shift change you'd find a dirty
4  ambulance. You might find a sharps -- IV needle that had
5  not been properly disposed of. And during a call, you
6  know, the employees got busy and things were overlooked.
7  And I, you know, put out memos that, you know, it is a work
8  rule and please clean the rigs when you come back at the
9  end of your shift. And the employees coming on at the
10 beginning of shift, you know, they were -- they let me
11 know. I did a lot of the checking, but they let me know if
12 somebody left a dirty rig. And the majority of the time,
13 you know, the verbal warning I gave was followed.
14 Q  Do you recall any occasions where you issued any written
15    warnings to any of the White Lake Ambulance Authority
16    employees?
17 A  I'm sure I did, but I don't -- they would be in the
18    personnel files. So I -- oh, yeah. I think there was one
19    to Mr. Hall. Mr. Hall was violating the computer policy
20    that we had.
21       MR. CALLAHAN: And I think at this point if we
22    really get into the substance of any kind of discipline
23    against any other employee I think we might be skirting the
24    Bullard-Plawecki kind of issues. So, you know, if we want
25    to enter into a Protective Order. I just want to make sure

(Pages 34 to 37)

Case 1:09-cv-00626-GJQ   ECF No. 52-4, PageID.482   Filed 07/07/10   Page 5 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
11

**Page 38**

1  that we don't have other problems that arise from this.
2  MR. GLAZIER: Yeah. Personally, I don't think
3  that there's any problem with Bullard-Plawecki, but it's
4  probably a good idea for us to have a Protective Order in
5  this case if we don't already.
6  MR. CALLAHAN: Okay. Well, we'll follow up.
7  We'll follow up with this.
8  MR. GLAZIER: All right.
9  MR. CALLAHAN: So testimony regarding, you know,
10  discipline with other employees, we'll follow up with that
11  for a Protective Order. And maybe it should be even
12  broader, because we've been discussing this back and forth
13  anyway. So we'll follow up to protect us.
14  MR. GLAZIER: Yeah.
15  Q  Do you recall approximately when it was that Mr. Hall
16     received this written warning for violating the computer
17     policy?
18  A  Mid '80s.
19  Q  What did he do that was in violation of the policy?
20  A  He went to an adult site.
21  Q  Using an Authority computer?
22  A  Correct.
23  Q  And how did you know that that had happened?
24  A  I was notified by the fire chief for the Montague Fire
25     District -- he was also a volunteer fireman -- of his

**Page 39**

1  activities. And so I didn't do it, but I had an employee
2  check the computer and there were some objectionable things
3  found on the computer.
4  Q  So you had someone go on the computer, and was this some
5     person with a background in IT, information technology,
6     that did the search of the computer?
7  A  I think it might have been just an employee or it might
8     have been Jean. I'm drawing a blank. But I know it was
9     looked into. I didn't want to see what was going on, I
10    just wanted to know if it was going on.
11 Q  Did Mr. Hall receive any other disciplinary notices during
12    his employment?
13 A  No. He quit simply because he was in enough trouble with
14    the Montague Fire District and he quit and went to work for
15    Oceana County EMS.
16 Q  Any other written warnings that you recall issuing when you
17    were the Director of the Authority?
18 A  I'd have to go back quite a ways, but Jeff Holmstrom
19    received a written reprimand.
20 Q  What did he receive a written warning for?
21 A  Just being a troublemaker, not following -- making a habit
22    of violating work rules.
23 Q  So I take it that with Mr. Holmstrom he had violated a
24    number of rules in the past, had received verbal warnings,
25    and his behavior wasn't improving and so he got a written

**Page 40**

1   warning?
2  A  In addition to another step. He was sent to counseling.
3  Q  What type of counseling?
4  A  The White Lake Ambulance Authority through Mercy Health
5     Partners has an agreement with Pine Rest that deals with --
6     they dealt with my post traumatic stress syndrome. And I
7     thought he was a valuable employee, he was knowledgeable,
8     but he had had some problems at a previous employer and
9     they seemed to follow him even after he would assure me
10    that he had the job that he really wanted and he could
11    follow our rules, and he was sent for counseling. Jean
12    would -- the office manager would have a record of that.
13 Q  Do you know approximately when it was that he was sent to
14    counseling?
15 A  I'm going to say mid '80s.
16 Q  And was he told that attending counseling was a condition
17    of his continued employment?
18 A  After checking with the attorney at that time, and that was
19    I believe Mr. Fielstra. It might have been Mr. Vander
20    Ploeg, but I'm not sure. Each employee got a Policy and
21    Procedure Manual, and it spelled out in the manual that
22    each employee was an at-will employee, could be terminated
23    without cause. And I didn't come up with that. The
24    attorneys who approved this came up with that. And where
25    was I going with this?

**Page 41**

1  Q  I don't know. My question was whether he was told that he
2     would need to see a counselor if he wanted to keep his job?
3  A  Okay. Yeah. He was a full-time employee, so I dealt with
4     him differently than the at-will employee.
5  Q  And with regard to whether or not he was told that he would
6     need to undertake this counseling if he wanted to keep his
7     job, what was he told?
8  A  I'll do the counseling. And he did satisfactorily.
9  Q  Okay. So you told him "Jeff, I think based on your
10    behavior that you need to see a counselor and I'm going to
11    require that you do that if you want to remain an employee
12    here," and he said "Okay, I'll do it"?
13 A  He had some personal issues that were, I think, very
14    difficult for him.
15 Q  I want to make sure that we have an understanding. When
16    you sent him to counseling was it made clear to him that
17    that wasn't just an option for him, that he was required to
18    undergo counseling?
19 A  Yes.
20 Q  Okay.
21 A  And I believe somewhere in there it says that at the
22    discretion of the Director as far as disciplining.
23 Q  What were the markers or the issues that were troubling to
24    you that you thought could be helped by Mr. Holmstrom
25    receiving counseling?

(Pages 38 to 41)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan 49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com

Case 1:09-cv-00626-GJQ   ECF No. 52-4,   PageID.483   Filed 07/07/10   Page 6 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
12

### Page 42

1  A  He had, I do believe, some sexual issues. I guess the old
2     term was he was a skirt chaser. And married women or women
3     who were committed to other individuals I didn't feel was
4     in his best interest.
5  Q  And how would you have learned that -- and I take it when
6     you say that he was a skirt chaser you're saying that he
7     was having sexual relationships with other women? Is that
8     what you're talking about?
9  A  Yes.
10 Q  Was Mr. Holmstrom married at the time?
11 A  It's difficult to remember, but -- he could have been. He
12    was married for a short period of time and had a child out
13    of the relationship.
14 Q  You had learned that he had had multiple sexual partners?
15 A  And I had learned from -- other people were talking about
16    his behavior, and so I questioned him about it. And, yeah,
17    he admitted that he was messed up. And I think he was the
18    one that broached the subject as to what can I do to make
19    sure I keep my job, and I said "Get help."
20 Q  The multiple sexual partners that Mr. Holmstrom had, was
21    this activity that was going on outside his working hours,
22    to your knowledge?
23 A  Yes, as far as I know. In a small-knit group you have some
24    people who like to keep track of people and they come and
25    tell you stories. And if you question the person about the

### Page 43

1   stories sometimes they'll give in and say yeah. And I just
2   thought that -- and I'm far from perfect, but I just
3   thought that it was affecting his performance as a
4   paramedic and I suggested -- and there are medical records,
5   I'm sure Jean has them, and he completed the -- not
6   training, but the counseling.
7  Q  And this was through Mercy Health Partners, you said?
8  A  I believe so. You know, it was so long ago it might have
9     even been Hackley Hospital before the merger. So it could
10    have been Hackley Hospital. Because we had several
11    organizations that we were involved with. And the -- I
12    want to say one thing, and it may be improper to say it,
13    but both Jean and I cared about the employees and
14    recognized they had faults like everybody has faults. And
15    if we could help them, we did. And we did help some
16    people. There are people who are still working there right
17    now doing a fantastic job. So --
18 Q  Was Mr. Holmstrom required to sign an authorization so that
19    his medical records relating to the counseling would be
20    released to the Authority?
21 A  I don't believe so. I know -- I believe they were in the
22    personnel file, but the personnel files, they were under
23    double lock and key, one in my office and one in Jean's
24    office. So we would not share medical records. Jean
25    worked in a hospital. She worked as a billing clerk, and

### Page 44

1     she was well aware of medical record issues. And I worked
2     in a hospital, and I was well-versed in medical record
3     issues.
4  Q  Somehow the record of Mr. Holmstrom's treatment and
5     counseling came into your possession, it sounds like. Is
6     that true?
7  A  Yes.
8        MR. CALLAHAN: I was going to object on
9     foundation, but go ahead and answer.
10 A  It was sent to us stating that he had successfully
11    completed his course of counseling.
12 Q  And do you know if that came from Mr. Holmstrom? Did he
13    send the records to you, or did they come from the --
14       MR. CALLAHAN: And I object on foundation.
15 A  I think they --
16       MR. CALLAHAN: And the foundation is the term
17    "records," because I think he's testifying to something
18    coming back saying that he had attended as opposed all the
19    records. So I think that there's a different language
20    being spoken here.
21 A  We had received information that -- to the best of my
22    knowledge, that he had completed his counseling. We -- our
23    health policies are if we have somebody who has a complaint
24    of a shoulder injury, we send him to be checked out. We
25    don't receive the complete records back, to the best of my

### Page 45

1     recollection, but they get a return to work certificate
2     signed by a physician.
3  Q  And do you recall whether you received the actual
4     counseling records or just this return to work
5     certification?
6  A  All I know is I was pleased and satisfied that he was going
7     to be an alright employee.
8  Q  Do you know how many counseling sessions he attended?
9  A  No. Jean, who kept, you know, track of employees' health
10    issues, she might know. She might remember. I don't know.
11    I can't tell you I do.
12 Q  Any other employees that you recall issuing written
13    warnings to?
14 A  No. I think that pretty much covers it.
15 Q  Any employees that you recall issuing suspensions to?
16       MR. CALLAHAN: Objection, foundation.
17 Q  Go ahead.
18 A  Right now I can't remember.
19 Q  Any employees who you recall terminating?
20 A  Yes.
21 Q  Who?
22 A  Tracy -- Emily, what was Tracy's last name?
23 Q  She's not going to be able to answer the question for you.
24 A  I'm sorry. Tracy.
25       MR. CALLAHAN: It's not like a normal

(Pages 42 to 45)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan  49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com

### Page 50

1  Q  And to your recollection was Mr. Easton placed on
2     suspension before his termination?
3  A  Apparently he was. I don't remember it. It might have
4     been -- well, I'm going to say it would have had to have
5     been pending the investigation by the State Police officer.
6  Q  I'm going to take a guess that these responses may be
7     something that was written in response to an unemployment
8     insurance claim that was submitted by Mr. Easton. Does
9     that refresh your recollection at all with regard to what
10    these numbers correspond to?
11 A  I have no recollection. I don't understand that.
12 Q  Okay. Item Number 4 on the second page of our Exhibit
13    Number 10 says "WLAA Policy and Procedures violation - Work
14    Rules Number 27. Conviction of a felony while an Ambulance
15    Authority employee." Do you see that?
16 A  Yes.
17 Q  And if we take a look at our Exhibit Number 8 on Page
18    Number 7, is there an Item Number 27 that says "Conviction
19    of a felony while an Ambulance Authority employee"?
20 A  Correct.
21 Q  So that's one of the work rules that were included in the
22    policy manual; is that right?
23 A  That is correct.
24 Q  Any other employees that you terminated that you can recall
25    during your tenure as the Director of the Authority?

### Page 51

1  A  No. No other employees.
2        MR. GLAZIER: Let's mark this as our next
3     exhibit.
4        (At 10:45 a.m., Deposition Exhibit 11 was marked
5     for identification.)
6  Q  I'm showing you what has been marked as Deposition Exhibit
7     Number 11. This looks like it's a memo that you wrote and
8     distributed to the staff with a date of April 6, 2005. Do
9     you see that?
10 A  Yes.
11 Q  About cell phone use while driving an ambulance; is that
12    right?
13 A  Yes.
14 Q  And it says that "Cell phone use is prohibited at all times
15    by any employee driving a vehicle owned by White Lake
16    Ambulance Authority." And that "Cell phone use will be
17    added to the Personnel Policies and Procedures Manual under
18    Article 1, Subsection R - Work Rules Number 31." Do you
19    know if the manual was ever amended to include this as an
20    additional work rule?
21 A  I made the comment earlier when I was looking at it that it
22    appeared to be not complete because I distinctly remember
23    this. So what happened to it, I have no idea.
24 Q  Do you recall seeing another version of the work rules that
25    had this driving a vehicle and operating a cell phone

### Page 52

1     prohibition included in the manual?
2  A  I can't say that. The reason I mentioned that earlier is
3     because I thought that this had been included and, you
4     know, getting to the last page I see Polaroid use, I see
5     some other things, but I didn't see anything about the cell
6     phone use. And that would have been Jean's baby to add it
7     to the -- she was in charge of the Policy and Procedure
8     Manuals.
9  Q  It looks like you may have read some information about the
10    increase statistically in traffic accidents when people
11    were using a cell phone; is that right?
12 A  Absolutely.
13 Q  Is that what prompted this memo to be distributed?
14 A  Yes. And I had other employees tell me that, you know,
15    they thought it was improper that somebody could call a
16    boyfriend or girlfriend, a husband, a wife, and be yacking
17    on the cell phone while they were driving a vehicle. And
18    that's what made me investigate. And I realized that --
19    and I think I've been proven by what has happened since
20    cell phones have come out where they cause accidents.
21    Driving here from Whitehall I probably saw four or five
22    people all over the road talking on a cell phone. I don't
23    think that it's -- it's no surprise that it's been proven.
24    And these are from the National Transportation website.
25    And I felt that it was totally inappropriate.

### Page 53

1  Q  To your knowledge, has any employee ever received a written
2     warning for violating a cell phone use while driving
3     ambulance rule?
4  A  This was posted before I was terminated. It was put in
5     everybody's mailbox and it was posted on our bulletin
6     board. I never had -- I had one complaint about a use of a
7     cell phone while I was still employed there.
8  Q  My question was did anyone ever receive a written warning
9     for violating the cell phone use while driving ambulance
10    rule?
11 A  No.
12 Q  Did anyone ever receive a verbal warning for violating the
13    cell phone use while driving ambulance rule?
14 A  Yes.
15 Q  And who received a verbal warning?
16 A  I can't say. But it was reported to me, and I called them
17    in the office and I said "I don't want you using your cell
18    phone." You know, I -- it was a while ago. I don't -- but
19    it was a hot button issue with me.
20 Q  So you recall having a conversation with one of the
21    employees where you said that you had heard that the
22    employee had used his or her cell phone, and you advised
23    the employee that that was a violation of the work rule and
24    don't do that? Is that your testimony?
25 A  Correct.

(Pages 50 to 53)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan 49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com

Case 1:09-cv-00626-GJQ   ECF No. 52-4,   PageID.485   Filed 07/07/10   Page 8 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
15

**Page 54**

Q But you don't recall the identity of the employee who you talked to?
A With 38 employees it's difficult.
Q And I'm not suggesting that you should remember or shouldn't remember. I'm just trying to find out if you know.
A I remember having that conversation because, as I said, I considered it to be a very important thing. And the facts are out there that it is an important thing.
Q Are you aware of any accidents that had occurred with White Lake ambulances or other vehicles where the employees were found to have been talking on a cell phone?
A No, but during my working hours when I did work, coming back from the hospital I saw a lot of crazy people doing crazy things.
Q And you were, obviously, trying to head off a collision by issuing a policy?
A Absolutely.
   MR. GLAZIER: Why don't we take another couple-minute break. It looks like it's time for you take some of your medication.
   MR. CALLAHAN: Sure.
   THE WITNESS: Yeah. Thanks.
   (At 10:51 a.m. until 10:59 a.m., a recess was taken.)

**Page 55**

(At 10:59 a.m., Deposition Exhibit 12 was marked for identification.)
   MR. GLAZIER: The record should reflect that Jean Dresen has entered the room. I presume that she's the corporate representative for purposes of this deposition?
   MR. CALLAHAN: Right. And she was present at the depositions of Ronald Kroll and Josh Easton and Kathy Sturgis.
Q I'm going to hand you what we've marked as Deposition Exhibit Number 12. This is an April 23, 2008 letter from a Troy Bowling, EMS Administrator, and a Dr. Jerry Evans, Medical Director. It says "Dear Emily Kroll," and it talks about a particular patient that was transferred on February 4th of 2008. And it says that, quote, "We are extremely proud that a paramedic like yourself functions in this county. As always, keep up the good work and professionalism. Because of your commitment to continue to provide this type of care, patients stand a better chance of survival in the future. Great job." Do you recall ever receiving a copy of this?
A Yes.
Q Did you receive it from Ms. Kroll, or were you copied on the letter?
A I think it was sent to the ambulance garage and we got it.
Q Is this indicative of what you had observed with regard to

**Page 56**

Emily Kroll's functioning in her responsibilities as a paramedic?
   MR. CALLAHAN: Objection, form and foundation.
Q Go ahead.
A I worked with Emily on calls, and I can never recall an incident, you know, where I found that she was not doing the job properly.
Q How frequently would you ride with Emily Kroll?
A Not very often. I think Emily rode with me a few times when I was transported. I'm not sure if I remember you being in back, but you were there. And as a patient, you took good care of me.
Q So now it sounds like you're referring to something a little different. That is, you had occasion to use the Authority as a patient?
A Yes.
Q And Emily Kroll was a paramedic that would have been attending to you or driving the ambulance?
A She attended to me and also she also drove. I don't know. I'd have the look at the run sheet. But I remember her as an employee of White Lake Ambulance doing a good job taking my vitals, explaining things. I think she blew an IV on me once, but I blew IVs on people, too.
Q What does that mean, to blow an IV?
A Where you have a vein and it's sticking out and you thread

**Page 57**

a plastic catheter in between a -- you know, a sharp needle. And sometimes you nick the vein and the vein just explodes and the fluid goes. But I had had a few runs because of incidents with my spine. And she wasn't the first one to miss an IV, but I didn't judge her on that. Her approach towards me as a patient is what I would expect from an employee.
Q Were there other occasions when you rode with Emily in connection with your role as the Director of the Ambulance Authority?
A Yes.
Q How many times would that have occurred?
A The ones that I'm thinking of involved a paramedic that I terminated, Tracy Burns. We've got the name now. I was required by the Director of the Muskegon County Medical Authority to ride with her and observe her on X number of runs because there were -- there was an MCMA complaint against her treatment of a patient.
Q By "her" are you talking about Tracy Burns or Emily Kroll?
A No, I'm talking about Tracy Burns. But Emily was Tracy's partner at the time. And I don't remember if she drove or whatever, but I know in just observing both of them I certainly didn't have a problem with the way she treated the patients that I observed her with.
Q And the "she" that you're referring to is you're talking

(Pages 54 to 57)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan 49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com

Case 1:09-cv-00626-GJQ   ECF No. 52-4, PageID.486   Filed 07/07/10   Page 9 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
16

### Page 58

1    about Emily Kroll?
2  A  Absolutely.
3  Q  Did you conduct any sort of written performance evaluation
4     for the paramedics that worked with you?
5  A  The full-timers I did. The part-timers it was a verbal,
6     sit down discussion.
7  Q  And Emily Kroll was in the part-time category; is that
8     right?
9  A  And she -- did you --
10         MR. CALLAHAN: You can't ask questions.
11         THE WITNESS: Yes, I just I realized that again.
12         MR. CALLAHAN: Okay.
13 A  At the time she was working when I was there she was a
14    licensed EMT specialist. She was not a paramedic. And I
15    don't know if she has obtained the paramedic licensure yet.
16    So I want to just clarify that. Not that it makes any
17    difference in her patient care, but --
18 Q  Let me reask the question as it pertains to a licensed EMT
19    specialist. Did you conduct annual performance evaluations
20    on a written basis for EMT specialists?
21 A  It was verbal.
22 Q  Did you have any licensed EMT specialists that were
23    full-time employees?
24 A  No.
25 Q  And during the time period that Emily Kroll worked for you

### Page 59

1     is it your recollection that when you sat down and had your
2     verbal discussions regarding her performance that you
3     always gave her a good performance evaluation?
4  A  I don't remember an annual review with her, but there were
5     times when I would look at her run sheet or I would be
6     aware of something that happened or somebody told me how
7     the call went and they included Emily. And I would say,
8     you know, good job. Good job, keep it up.
9  Q  Do you recall if you ever issued a suspension against Emily
10    Kroll?
11 A  Never.
12 Q  Did you ever issue a written warning against Emily Kroll?
13 A  No.
14 Q  Do you recall ever giving her a verbal reprimand?
15 A  I might have. I can't think of an employee that didn't
16    receive a verbal reprimand at one time or another.
17 Q  Do you recall any specific verbal reprimand that you gave
18    to Emily Kroll?
19 A  I can't remember right now.
20 Q  Okay. There came a time, as I understand it, where you
21    talked with Emily Kroll and requested that she undergo
22    psychological counseling; is that right?
23 A  I don't think I used the term "psychological." But we did
24    have, as I mentioned earlier, a medical organization that
25    we could send people who had family problems, had life

### Page 60

1     problems, and I did request that she go.
2  Q  Was that the Mercy Health Partners group, if you can
3     recall?
4  A  I'm guessing -- and I'll go back to it, because we used
5     Hackley and Mercy Health Partners/Pine Rest. So it could
6     have been either one.
7  Q  Is Pine Rest part of that Hackley organization or Mercy
8     organization in Muskegon?
9  A  It was originally part of the Mercy, then when Mercy merged
10    with Hackley and Muskegon General it's all one big,
11    somewhat happy family now.
12 Q  Would it be fair to say that the request was that she see a
13    psychologist to discuss issues related to her mental
14    health?
15 A  Correct.
16 Q  Do you recall when it was that you had that discussion with
17    her?
18 A  It would have been before I was terminated, and I was
19    terminated in August. So --
20 Q  I think the records in this case show that Emily Kroll's
21    last day of employment or last appearance at the ambulance
22    garage was April 28th of 2008. Does that sound about
23    right?
24 A  If that's what the records show then that is right.
25 Q  In terms of your own personal recollection, you just don't

### Page 61

1     recall?
2  A  No, I don't recall.
3  Q  Other than it was before your termination?
4  A  Uh-huh. Correct.
5  Q  Who was in the meeting with you when you had this
6     discussion with Ms. Kroll?
7  A  The original discussion was between Emily and myself.
8  Q  And do you recall -- let me ask you a different question.
9        There was a date when Emily Kroll came to the
10    Ambulance Authority with her father and she put her keys on
11    the table and it was the end of her employment. Do you
12    recall that date?
13 A  Yes.
14 Q  Do you recall how much earlier in time you had the meeting
15    with Emily Kroll that you just referred to?
16 A  Maybe a week.
17 Q  And what was discussed between the two of you? What did
18    you say and what did she say to the best of your
19    recollection?
20 A  What I said was "I've gotten complaints in regards to you.
21    I had a complaint in regards to you screaming at a male
22    acquaintance of yours while you were driving a vehicle
23    loaded with a patient and you were driving emergency status
24    with lights and sirens." And I thought it was very
25    improper and great concern for the well-being of not only

(Pages 58 to 61)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan 49501
(800) 234-2044   (888) FAX-6776   gls@greatlakesshorthand.com   www.greatlakesshorthand.com

Case 1:09-cv-00626-GJQ ECF No. 52-4, PageID.487 Filed 07/07/10 Page 10 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
17

**Page 62**

1   Emily but her partner and the patient and the people
2   surrounding the vehicle as it was driving fast down the
3   highway.
4  Q  Who was it that had made the complaint?
5  A  I don't remember. I know that I spoke to Mr. Pannucci in
6     regards to the episode, and he requested that if there were
7     any employees who had problems with Emily to write
8     affidavits, have them notarized, and send them to him for
9     review. And I may be -- that's just the best that I can
10    come up with as far as my memory. And there were concerns
11    expressed by the employees and there were affidavits that
12    were filed. I'm not sure if that's the proper word, but --
13 Q  The complaint that you had received that Emily was
14    screaming at a male co-worker and driving the ambulance,
15    was the complaint from Josh Easton?
16 A  I don't remember who it was.
17 Q  Was Josh Easton the person that she was accused of
18    screaming or having a loud conversation with while driving
19    the ambulance?
20 A  There were people who made suggestions as to who it could
21    have been, and I do believe they are probably in the
22    affidavits. I haven't seen those in a long time.
23 Q  Was the complaint that it was Emily Kroll and a male EMT
24    who were driving the ambulance and Emily was having a loud
25    conversation or screaming at this co-worker?

**Page 63**

1  A  You know, I -- the co-worker -- she was on her cell phone
2     talking to an individual. She wasn't discussing anything
3     with her partner who was taking care of the patient. She
4     was on her cell phone.
5  Q  Do you know who the EMT or paramedic partner was?
6  A  I'd have to look at the record. I don't remember that.
7     I'd have to look at the run sheet.
8  Q  Do you have a copy of the run sheet available or does White
9     Lake Ambulance Authority have a copy of the run sheet?
10 A  It's a patient record, so a copy would be in the medical
11    records.
12 Q  In order to find that run sheet you'd have to know the date
13    of the run; is that right?
14 A  I think the current Director could find that date by
15    looking at the run sheets.
16 Q  So it's your best recollection that the complaint was that
17    Emily was in the ambulance and was having a heated
18    conversation with someone on her cell phone during the
19    transportation of the patient?
20 A  (Nodding).
21 Q  And you're nodding your head yes. Is that right?
22 A  Yes. I'm sorry. Yes.
23 Q  But you're not sure who the partner was; is that right?
24 A  I don't -- I can't remember. If I had the run sheet in
25    front of me I'd probably be able to tell you.

**Page 64**

1  Q  And you can't recall the date that that took place; is that
2     right?
3  A  No. It had to be sometime in the spring before she threw
4     her keys and pagers on my desk and I was terminated. So we
5     can narrow it down from there.
6  Q  Do you know what role Emily Kroll was playing on the
7     transport that day? That is, do you know if she was the
8     person driving the ambulance?
9  A  I was informed that she was driving.
10 Q  And did you ask Emily Kroll whether or not that the
11    accusation that had been made against her was true?
12 A  I discussed it with her, and she wasn't very responsive to
13    me.
14 Q  Did she admit that she was talking on her cell phone while
15    driving?
16 A  She didn't even go that far.
17 Q  Did she deny that she was talking on her cell phone while
18    driving?
19 A  She didn't even go that far. She turned on her heels and
20    walked out.
21 Q  Do you recall any comments that she made with regard to the
22    accusations that had been made against her?
23 A  I don't think she said a word. I got the impression that
24    she didn't want to talk by her silence.
25 Q  And did you indicate to Emily Kroll that she was receiving

**Page 65**

1     a verbal warning for talking on her cell phone while
2     driving?
3  A  I think I might have said "Consider this your verbal
4     warning." I don't remember. I was upset that an employee
5     would treat me that way when I considered it and I have
6     proved my concern about cell phone talking in an ambulance,
7     especially with being loaded with a patient and driving
8     emergency status. So --
9  Q  Well, earlier in the deposition I asked you whether you had
10    ever issued a verbal warning against Emily Kroll.
11 A  I --
12 Q  Try to wait until I'm done with my question. And you said
13    that you didn't recall or you hadn't issued any verbal
14    warnings. Do you recall that testimony?
15 A  I recall that testimony.
16 Q  And was that accurate at the time?
17 A  That was accurate at the time.
18 Q  Okay. Would it be fair to say that you're not sure if you
19    ever used the terminology "this is a verbal warning" when
20    you were talking with Emily about this issue?
21 A  I think that could have been accurate.
22 Q  So it sounds like this was a short meeting. Emily Kroll
23    came into your office, you said that you had heard a
24    complaint that she was talking loudly on a cell phone while
25    driving, she didn't admit or deny it and walked out of your

Case 1:09-cv-00626-GJQ   ECF No. 52-4, PageID.488   Filed 07/07/10   Page 11 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority
18

## Page 66

1  office. Is that a fair characterization?
2  A  To the best of my memory, yes.
3  Q  When is the next time that you had any discussion with
4     Emily Kroll with regard to any issues related to her
5     performance or employment?
6  A  After contacting Mr. Pannucci and Mr. Pannucci recommending
7     that we get some affidavits. And when the affidavits came
8     in Jean and I talked, and it was our thoughts that she was
9     a good EMT and her life was a mess and we could help her.
10    We had the resources to help her, and we would try to help
11    her. And that is when -- it was Jean's job to schedule
12    appointments for this type of thing, and I'm -- again, I
13    am -- my memory isn't that great, but I know she was either
14    notified by me or Jean that we requested her to go. And
15    from there the next thing I remember is when she and her
16    father came in, and it wasn't too pretty. I had three
17    employees in my office and Jean was within earshot to see
18    things and hear things. And I told her at the time that we
19    were doing it to help her. And, you know, I never -- I
20    never had a problem with her as far as patient care.
21         MR. GLAZIER: Let's mark that as our next
22    exhibit.
23         (At 11:20 a.m., Deposition Exhibit 13 was marked
24         for identification.)
25  Q  I'm handing you what we've marked as Deposition Exhibit

## Page 67

1   Number 13. And this is a letter dated June 18, 2008 to you
2   by a Julie Betka, and it also has a notary statement on the
3   bottom indicating that it was subscribed and sworn to on
4   the 18th of June 2008. Is this the affidavit -- one of the
5   affidavits that you made reference to earlier?
6  A  Yes.
7  Q  And there are a couple of these affidavits -- or a few of
8     these affidavits, I should say. I think that they all bear
9     this date or around this date of the 18th of June of 2008.
10    Emily Kroll's last day of employment was April 28th of
11    2008. Do you recall whether you secured any affidavits
12    before Emily Kroll's last day of employment?
13 A  I don't recall. There was a time when I -- Jean -- had
14    Jean contact Pannucci and get his advice, and I don't
15    remember what time frame that was.
16 Q  Do you recall if the person that complained about this loud
17    phone call while driving an ambulance was male or female?
18 A  It was a male, I do believe.
19 Q  Do you know if it was the person that was in the ambulance
20    at the time?
21 A  It was the person who was taking care of the patient, and
22    the medical records would identify that person. But I'm
23    not going to take a guess at it because I'm not sure who it
24    was.
25 Q  Do you know how long the conversation lasted?

## Page 68

1  A  No.
2  Q  Was this the first time that you had heard a complaint
3     about Emily talking on her cell phone while driving?
4  A  It's the first time, yes.
5  Q  And was it the only time that you heard any complaints of
6     that sort?
7  A  Of that sort, yes.
8  Q  You testified that you had each reached the conclusion that
9     Emily Kroll's personal life was a mess, or words to that
10    effect. What were you referring to?
11 A  I think that her involvement affected -- was beginning to
12    affect her work status. I -- looking at this letter, how
13    many things do you want me to pick out that, you know, are
14    not appropriate?
15 Q  Well, let me ask the question a little differently.
16 A  Okay.
17 Q  You had testified previously about an employee who you
18    thought was a -- I think a skirt chaser is the terminology
19    that you used --
20 A  Uh-huh.
21 Q  -- to describe Mr. Holmstrom?
22 A  Uh-huh.
23 Q  Is that correct?
24 A  That is correct.
25 Q  And did you have similar concerns with regard to Emily

## Page 69

1   Kroll? That is, that she was -- that there were problems
2   with her being involved, dating, or having sexual
3   relationships with men?
4  A  I had the same concerns.
5  Q  And what is it that led you to have those concerns?
6  A  What led me to have these concerns were, as an example,
7     this one (indicating). If you have the other affidavits,
8     there was one that said that -- it was a female and said
9     that Emily was stalking her.
10 Q  Well, here's what I'm trying to do, Mr. Binns, we have
11    these affidavits that were prepared in mid to late June.
12 A  Uh-huh.
13 Q  Emily Kroll was terminated in the end of April of 2008.
14    She then filed a charge with the Michigan Department of
15    Civil Rights, and it's my understanding that these
16    affidavits were produced in response to the discrimination
17    charge that was filed. What I'm trying to find out is what
18    you were told before April 28 about Ms. Kroll, not what
19    employees said in affidavits after the fact.
20 A  The things that are in the affidavits were told to me prior
21    to her quitting.
22 Q  Well, let's talk about that.
23 A  Okay.
24 Q  When is the first time that any employee complained to you
25    about Emily Kroll's personal life or her dating life?

Case 1:09-cv-00626-GJQ ECF No. 52-4, PageID.489 Filed 07/07/10 Page 12 of 12

Brian Binns
Emily C. Kroll vs.
March 9, 2010
White Lake Ambulance Authority

```
 1                          CERTIFICATE

 2   STATE OF MICHIGAN    )
                          ) SS:
 3   COUNTY OF KENT       )

 4           I certify that this transcript, consisting of 115

 5   pages, is a complete, true, and correct record of the testimony

 6   of BRIAN BINNS held in this case on March 9, 2010.

 7           I also certify that prior to taking the deposition,

 8   BRIAN BINNS was duly sworn to tell the truth.

 9

10   Carrie Clark-Berry
     _____
11   CARRIE S. CLARK-BERRY, CSR-4402
     Registered Professional Reporter
12   Notary Public, Ottawa County, Michigan
     Acting in Kent County, Michigan
13   My commission expires:  06/23/12
     Dated:  This 12th day of March, 2010
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 115