# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMILY C. KROLL,

      Plaintiff,

-vs-                                    File No. 1:09-CV-626

WHITE LAKE AMBULANCE AUTHORITY,         HON. GORDON J. QUIST

      Defendant.
_____/

VIDEOTAPED DEPOSITION OF AMY CALLISON

    Taken by the Plaintiff on the 13th day of May 2010, at
the offices of Plunkett Cooney, 120 W. Apple Avenue,
Muskegon, Michigan, at 3:44 a.m.

APPEARANCES:

For the Plaintiff:    Mr. Bradley K. Glazier (P-35523)
                      Bos & Glazier, PLC
                      990 Monroe Avenue, NW
                      Grand Rapids, Michigan 49503
                      (616) 458-6814
                      bglazier@bosglazier.com

For the Defendant:    Mr. Robert A. Callahan (P-47600)
                      Plunkett Cooney
                      950 Trade Centre Way, Suite 310
                      Kalamazoo, Michgan 49002
                      (269) 3882-5935
                      rcallahan@plunkettcooney.com

                      Mr. Douglas M. Hughes (P-30958)
                      William, Hughes & Cook, PLC
                      120 W. Apple Avenue
                      Muskegon, Michigan 49443
                      (231) 727-2119
                      doughughes@whcspc.com

Also Present:         Ms. Emily Kroll and Ms. Jean Dresen

REPORTED BY:          Carrie S. Clark-Berry (CSR-4402)
                      Certified Shorthand Reporter
                      Registered Professional Reporter

Case 1:09-cv-00626-GJQ   ECF No. 52-5,  PageID.492   Filed 07/07/10   Page 3 of 5

Amy Collison                                                    May 13, 2010
Emily C. Kroll vs.                                    White Lake Ambulance Authority

5

**Page 14**

```
1   A   Yeah.  That was -- I really felt in my heart that she
2       was suicidal at the time because she was so emotional, and
3       some of the things that she would say kind of scared me.
4       And I didn't want her to hurt herself, so I reported it
5       like any other person would do.
6   Q   And what did Brian Binns say in response to your report?
7   A   That he was going to set her up with counseling and that
8       they had -- he said he had already done that once before
9       for her.
10  Q   For Emily Kroll?
11  A   Correct.  He had did that once before but she never
12      conveyed with it or she never went with it or something.
13  Q   Did he tell you when it was that he had requested Emily
14      receive counseling in the past?
15  A   No, he didn't tell me when.  He didn't tell me anything.
16      He said he had done it before.  Being in the ambulance
17      service you go through a lot.  So they do have counselors
18      on hand anyways to help go through the situations that
19      you're -- you've seen.  The things that you've seen.  So,
20      you know --
21  Q   Had you ever talked to Emily Kroll yourself and suggested
22      that she receive counseling?
23  A   I did.  I did.
24  Q   When did you do that?
25  A   One of our many conversations.  We were -- we were good
```

**Page 15**

```
1       friends.
2   Q   And you don't recall the timing, I take it?
3   A   I can't tell you the time.  I honestly can't.
4   Q   And what did she say in response when you suggested that
5       she get some counseling?
6   A   Her actual response was she didn't think she needed it but
7       she just needed somebody to talk to.  A friend to talk to.
8   Q   And were you one of those friends that she could talk to
9       and share her concerns?
10  A   I was.  I was always there.  I was concerned.  And when I
11      had talked to her about going to counseling she didn't do
12      it, so that's when I went to Brian.
13  Q   Do you have any training yourself in the mental health
14      field?
15  A   Absolutely not.
16  Q   And other than the one circumstance where you and your
17      stepdaughter met with a counselor I take it you have not
18      had any other experience with mental health counseling?
19  A   No.
20  Q   You make reference in this statement to an incident where
21      you were shopping at the Montague Foods store and when you
22      came out Emily was parked next to your vehicle and was
23      upset?
24  A   Yes.
25  Q   And you talked with her on that occasion?
```

**Page 16**

```
1   A   I did.  I even gave her a hug that day.
2   Q   And did you think that she had followed you to the store?
3   A   I did.  Because it was very odd for her to show up parked
4       next to my car in her car as I was in the store and she was
5       just parked there.
6   Q   And did you ask her if she had followed you to the store?
7   A   No.
8   Q   Has that ever happened to you in the past where you've run
9       into someone in a small town like Montague and --
10  A   Well, of course you run into people.  Yeah.
11  Q   You don't have any reason -- a reason to believe that she
12      followed you to the store other than the fact that she
13      happened to be parked next to your vehicle when you got out
14      of the store; is that fair to say?
15  A   Yeah.  I just thought it was a little strange.  I thought
16      it was very strange.
17  Q   But you never talked to Emily Kroll and asked her why it
18      was that she was parked there that day, true?
19  A   True.  I didn't -- she was bawling, so I didn't want to --
20      she was already emotional.  I didn't want to like "Are you
21      stalking me?"  Ask her that.  And I have seen her drive by
22      my house plenty of times.  So -- and I was aware that other
23      people from White Lake had already said that she made a
24      habit of driving by people's houses.
25  Q   Who was it that told you that?
```

**Page 17**

```
1   A   Jodi.
2   Q   Anyone else?
3   A   Just Jodi.
4   Q   Your statement indicates that you were told by another WLAA
5       employee that your house was on the way back to the
6       Authority from the Lakeshore Emergency Room?
7   A   Correct.
8   Q   And that's true, correct?
9   A   Correct.
10  Q   What street did you live on at that time?
11  A   Oceana Drive.
12  Q   Did you ever ask Emily if she was purposely driving past
13      your house for some reason?
14  A   No, I didn't.  I didn't, because she was already an
15      emotional wreck.  I tried helping her, and there was
16      nothing that I could do as a friend to help her so I didn't
17      want to get involved anymore with any more drama.  I didn't
18      want to do it anymore.  I have my own family to deal with.
19      I don't want to deal with other people's problems.
20  Q   Was she ever parked outside of your house looking into your
21      windows?
22  A   No, not that I -- no, not that I know of.
23  Q   You're just talking about her driving by the house?
24  A   Yeah, I've seen her drive by my house many times.
25  Q   How many times?
```

(Pages 14 to 17)

**Page 18**

1  A  Oh my gosh, I can probably recall at least three, four.
2  Q  And you thought that was unusual?
3  A  I thought that was unusual, yes.  I mean, given -- you're
4     asking me this, but given the fact that what the emotional
5     emotions that she had had and what I had known from her
6     personally, I thought that was a little bit strange.
7  Q  I take it that there was a time, according to your report,
8     that you requested that Emily Kroll stop texting you?
9  A  Yes.  I had told her many times to stop texting me.  I do
10    not have my phone.  I did not save any of those texts.  But
11    she did text me a lot.  And then my husband and my bill
12    were pretty high, and I told her to stop texting me because
13    she was doing it all the time.  Like that's all she did,
14    was text.
15 Q  And for a while I take it for you would be texting her
16    back?
17 A  I did text her back.  Like I said, we were friends.  So,
18    yes.
19 Q  And then when the friendship ended you requested that she
20    stop texting you?
21 A  Yes, I did.
22 Q  And I take it that the texting did stop then?
23 A  Eventually it did, yeah.
24        (Mr. Hughes is now present in the room.)
25 Q  Your statement indicates that on several occasions Emily

**Page 19**

1     Kroll told you that she wanted to go into a big black hole
2     and disappear?
3  A  Yeah.  That's what scared me.  That's why -- that's one of
4     the things I reported to Brian.  Because she called -- I
5     don't remember what time it was, but I knew it was late.
6     And she was just sobbing and bawling and I didn't know
7     whether to go over there or not, so I just stayed on the
8     phone with her for a while.  And that next day I went to
9     Brian and I told him something needs to be done because I
10    don't want to see her hurting herself.
11 Q  So you, according to your report, interpreted this as a cry
12    for help and her possibly being suicidal?
13 A  Absolutely.
14 Q  But you never asked Emily Kroll, you know, do you have a
15    desire to hurt yourself?  You never asked her if she was
16    suicidal, I take it?  Is that true?
17 A  No.  I believe I've asked her if she was going to do it
18    before.  I know I did.
19 Q  And what did she say in response?
20 A  No.  Of course she wasn't going to.
21 Q  She said, no, I'm fine, don't worry about it?
22 A  Yeah.  Yeah.  But the calls that I got with her bawling and
23    saying she wanted to go in a deep black hole or just go in
24    a corner, I mean, that -- you know --
25 Q  Do you recall when it was in relationship to Emily Kroll's

**Page 20**

1     last day at work that you conveyed this information to Mr.
2     Binns?
3  A  Can you rephrase that?
4  Q  Sure.  Your statement indicates that on -- you say on
5     several occasions Emily Kroll told you that she wanted to
6     go into a, your words, big black hole and disappear.  And
7     you've testified that you conveyed that information at some
8     point to Brian Binns?
9  A  Yes, I did.
10 Q  And I think you testified previously that you don't
11    remember the date that that occurred?
12 A  I don't.
13 Q  My question is in relationship to the -- to Emily Kroll's
14    last day of work, which was April 28, does that help you
15    place when you first talked to Brian Binns about it?  For
16    example, was it in the month of March?  April?
17 A  It was -- it was a couple months after I had started --
18 Q  Okay.
19 A  -- at White Lake Ambulance.
20 Q  And you started when again?  You didn't recall the exact
21    date.
22 A  I know.  And I can't even tell you right now.
23 Q  Let's work backwards.  You said that you left around July
24    of 2009; is that right?
25 A  Yeah.  Yeah, I did.

**Page 21**

1  Q  And you said that you worked there for about a year and a
2     half?
3  A  Yeah.
4  Q  So you must have started around January of 2008 then; is
5     that right?
6  A  Yeah.  I must have, yup.
7  Q  And so it would have been more than a month -- a month or
8     two of you first starting?
9  A  About a month or two, yeah.
10 Q  So February, March time frame of 2008?
11 A  Uh-huh.
12 Q  That's a yes?
13 A  Yeah.  Sorry.  Yes.
14 Q  Did you talk to anyone else besides Brian Binns about your
15    concerns over Emily Kroll?
16 A  Jean had come into the office, too.  So, yeah.
17 Q  So Jean was in the office along with Brian Binns?
18 A  Yes.  Uh-huh.  Them -- they were concerned for her, too.
19    Well, not so much Brian, but Jean was.
20 Q  What do you mean not so much Brian?
21 A  He was like, "Yeah, I've done it before."  And Jean's
22    like "Well, I'll try to get an appointment set up or
23    something and talk to her and see what we can do."  So,
24    yeah.
25 Q  Was it your impression that they were going to present

(Pages 18 to 21)

Great Lakes Shorthand, P.O. Box 2002, Grand Rapids, Michigan  49501
(800) 234-2044   (888) FAX-6776  gls@greatlakesshorthand.com   www.greatlakesshorthand.com

©

Page 27

```
 1                        CERTIFICATE

 2   STATE OF MICHIGAN      )
                           ) SS:
 3   COUNTY OF OTTAWA       )

 4            I certify that this transcript, consisting of 27

 5   pages, is a complete, true, and correct record of the testimony

 6   of AMY CALLISON held in this case on May 13, 2010.

 7            I also certify that prior to taking the deposition,

 8   AMY CALLISON was duly sworn to tell the truth.

 9

10   Carrie Clark-Berry

11   CARRIE S. CLARK-BERRY, CSR-4402
     Registered Professional Reporter
12   Notary Public, Ottawa County, Michigan
     Acting in Muskegon County, Michigan
13   My commission expires:  06/23/12
     Dated:  This 18th day of May, 2010

14

15

16

17

18

19

20

21

22

23

24

25
```