UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

EMILY C. KROLL,

        Plaintiff,

v.                                                                                                Case No. 1:09-CV-626

WHITE LAKE AMBULANCE                                        HON. GORDON J. QUIST
AUTHORITY,

        Defendant.
_____/

# OPINION

      Plaintiff, Emily C. ("Kroll"), has sued her former employer, White Lake Ambulance Authority ("WLAA"), in a three-count complaint alleging that WLAA violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), when it required her to attend counseling as a condition of retaining her employment. In Count I, Kroll alleges that WLAA violated the ADA's prohibition against medical examinations and inquiries by requiring her to attend psychological counseling without proof that Kroll's mental health condition posed a "direct threat" or impaired her ability to perform essential job functions. In Count II, Kroll alleges that WLAA retaliated against her in violation of the ADA for refusing to attend counseling. Finally, Count III alleges that WLAA discriminated against Kroll in violation of Title VII by compelling her to undergo counseling for having an affair with a married man, while it did not require male employees to undergo counseling for the same behavior.

      WLAA has moved for summary judgment on all claims. In her response, Kroll stipulates to summary judgment on the Title VII claim alleged in Count III. (Pl.'s Resp. Br. at 1 n.1.) In

addition, Kroll has waived or abandoned her retaliation claim in Count II by failing to present any argument or evidence supporting the claim in her response to the motion. *See Washington v. Delta Bus. Coll.*, 287 F. App'x 367, 368-69 (5th Cir. 2008) (concluding that the appellant waived any argument regarding the statute of limitations by failing to mention it in his opening brief on appeal); *Pugh v. City of Attica*, 259 F.3d 619, 624 n.3 (7th Cir. 2001) (noting that the plaintiff waived his alternate claims by failing to address them in his brief in response to the defendant's motion for summary judgment). Thus, the sole remaining claim is Kroll's prohibited medical examination/inquiry claim under the ADA in Count I.

After careful consideration, the Court concludes that the parties' briefs adequately address the issues pertaining to the motion and that oral argument is unnecessary. For the reasons set forth below, the Court will grant WLAA's motion for summary judgment and dismiss Kroll's complaint with prejudice.

**I. BACKGROUND**

WLAA is a governmental entity formed by the Cities of Whitehall and Montague, Michigan, to provide emergency medical services to residents of those communities. WLAA hired Kroll in September 2003 as a part-time emergency medical technician ("EMT"). In her capacity as an EMT, Kroll drove the ambulance and assisted the paramedic with whom she was on duty with the medical care of patients being transported. During her tenure with WLAA, Brian Binns ("Binns") served as WLAA's Director and Jean Dresen ("Dresen") was the office manager.

During her employment with WLAA, Kroll performed her EMT job well and was never disciplined. Kroll's co-workers believed that she was a good employee and had excellent job skills.

In late 2007 or early 2008, Kroll, who was single, began an affair with another WLAA employee, Joshua Easton ("Easton"), who was married. This relationship lasted approximately four

2

months and was often tumultuous. Easton had promised Kroll that he would get a divorce, but he never carried through on his promise. Easton and Kroll often argued, and at times, each became jealous of the other having relationships outside of this extra-marital affair. For example, on Valentines Day, 2008, Easton gave Kroll roses and later found out that another man had sent her flowers. Easton obtained Kroll's cell phone and checked her messages to determine who had sent her flowers. Kroll and Easton got into a fight after Kroll learned that Easton had checked her messages. On another occasion, Easton hacked into Kroll's e-mails to read them. Kroll yelled at Easton at work when she learned that Easton had hacked into her e-mail account. Eventually, Kroll suspected that Easton was having a sexual relationship with Jodi Osborn, another female WLAA employee.

Kroll was often upset over her relationship with Easton. Kroll's coworkers, some of whom were her friends, observed Kroll's behavior both on and off the job and reported their concerns for Kroll's mental well-being to both Dresen and Binns. Amy Callison, a coworker who was also a close friend of Kroll, told Binns that she believed Kroll needed counseling because she "was an emotional wreck." (Callison Dep. at 12.) In fact, Callison believed that Kroll was suicidal because of some of the things Kroll said, and she shared this belief with Binns. (*Id.* at 14.) For example, Callison related that on one occasion when she came out of a grocery store, Kroll was parked next to her car in the parking lot and was upset and crying (*Id.* at 15-16.) Callison said that Kroll told her that she wanted to go into a big black hole and disappear, which Callison interpreted as a cry for help. (*Id.* at 19.) Callison believed that Kroll had followed her to the store and thought her behavior was "strange." (*Id.* at 16.) Callison suggested to Kroll that she needed counseling but Kroll said that she only needed to talk to a friend. (*Id.* at 15.) Callison told both Dresen and Binns about this

3

incident.[1]

Dresen and Binns received several other reports from employees concerning Kroll's emotional behavior, including comments that Kroll would often cry at work and used her cell phone to call and text Easton while operating an ambulance, which was specifically prohibited by WLAA policy. (Osborn Sodini Dep. at 28-29; Terpstra Dep. at 27, 30, 32.) On one occasion, while at work at WLAA, Kroll called Dresen at home and was crying. (Dresen Dep. at 23.) Dresen told Binns about this call because Kroll was on duty.

On or around April 21, 2008, and after seeking input from various WLAA employees about Kroll's emotional stability, Binns instructed Dresen to contact Hackley Work Place Health to try to arrange counseling for Kroll. After speaking with someone at Hackley Work Place Health, Dresen told Kroll that she had arranged counseling for Kroll and that Kroll would need to contact the Red Cross to inquire about financial assistance since she did not have insurance. (*Id.* at 39.) Dresen also requested that Kroll sign a release so WLAA could verify that Kroll was attending the weekly sessions, as Kroll had previously agreed to counseling but lied to WLAA about her attendance. (*Id.* at 39-40.) Although it is not clear from the record, it appears that Kroll rejected Dresen's request that she attend the counseling.

On April 28, 2008, the issue of counseling came to a head as a result of an incident between Kroll and Jodi Osborn, a paramedic with whom Kroll had been working. Sometime prior to the incident, Kroll forwarded an e-mail to Osborn that she had previously sent to Easton. The text of the e-mail inquired of Easton: "Have u done Jodi? Or anything sexually with her at all.?" During a call on April 28, Kroll and Osborn got into an argument about the e-mail while they were

---

[1] Kroll disputes many of the details of Callison's account of this incident. Nonetheless, it is undisputed that Callison conveyed this information to Dresen and Binns.

4

administering care to a patient. According to Osborn, Kroll failed to respond to her request to administer oxygen to the patient, even though Kroll was standing right next to Osborn and should have heard her request. Ultimately, Osborn administered the oxygen herself. (Osborn Sodini Dep. at 35.) Upon returning to the WLAA garage, Osborn reported this incident to Binns. (*Id.* at 36.) Later in the day, Kroll and her father went to speak with Binns at the WLAA. Binns told Kroll that she needed to go to counseling and that she would be permitted to keep her job only if she completed the counseling. (Holmstrom Dep. at 10-11.) Kroll told Binns that she would not go to counseling, put her key and pager on Binns' desk, and walked out. (*Id.* at 11.) Kroll has not since worked at WLAA.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

Kroll alleges that WLAA violated the ADA's medical examination/inquiry prohibition when it required her to attend psychological counseling. The provision at issue states:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). This provision was enacted to ensure that employers do not require medical tests or make disability-related inquiries of employees that do not serve a legitimate business interest. *Ward v. Merck & Co.*, No. Civ. A. 04-CV-5996, 2006 WL 83114, at *8 (E.D. Pa. Jan. 9, 2006) (quoting 56 Fed. Reg. 35,726, 35, 750 (July 26, 1991)). An employer may require an employee to submit to a medical examination "that is job-related and consistent with business necessity." 29 C.F.R. § 1630.14(c). The Sixth Circuit has held that an employer's request for a medical exam is permissible only if there is "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). Behavior that is "merely annoying or inefficient" cannot justify a request for an exam. *Id.* The Equal Employment Opportunity Commission (EEOC) advises that an examination is permissible where the employer "has a reasonable belief based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." EEOC, Enforcement Guidance: Disability-Related Inquiries and Med. Examinations of Employees Under the Americans With Disabilities Act, No. 915.002 (July 27, 2000) ¶ 5 (hereafter "EEOC Enforcement Guidance"), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html.

The Court need not determine whether WLAA had a reasonable basis to justify its demand that Kroll attend counseling because, contrary to Kroll's claim, counseling alone does not constitute a medical examination under the ADA. Neither the ADA nor the regulations or interpretive guidance issued by the EEOC define the term "medical examination." The EEOC interpretive

guidance does indicate, however, that a medical examination includes tests or evaluations that yield results or data furnished to the employer:

> This provision [29 C.F.R. § 1630.14(c)] permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job. . . .
>
> . . . .
>
> The information obtained in the course of such examination or inquiries is to be treated as a confidential medical record and may only be used in a manner not inconsistent with this part.

29 C.F.R. Part 1630, App. § 1630.14(c).[2]

The EEOC Enforcement Guidance further explains the scope of a medical examination. It defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health." EEOC Enforcement Guidance ¶ 2. The EEOC also lists several factors that may be considered in determining whether a test or procedure is a medical examination:

> (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or [sic] physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

*Id.* (footnote omitted). Examples of medical tests include "vision tests conducted and analyzed by an ophthalmologist or optometrist"; "blood, urine, and breath analyses to check for alcohol use"; "blood pressure screening and cholesterol testing"; and "psychological tests that are designed to identify a mental disorder or impairment." *Id.* Tests or procedures that do not constitute medical

---

[2] The EEOC's administrative interpretations of the ADA are not controlling authority but "do constitute a body of experience and informed judgment to which courts and litigants may property resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404 (1986).

7

examinations include "psychological tests that measure personality traits such as honesty, preferences, and habits." *Id.*

In this case, nothing in the record suggests that the counseling WLAA required Kroll to attend would have involved or required psychological testing. In addition, no evidence shows that any results, findings, or other information derived from testing or evaluation would have been furnished to WLAA. While WLAA did ask Kroll to sign a release, it was only for the limited purpose of verifying that Kroll was actually attending counseling and not, as Kroll suggests, to obtain "records of treatment." (Pl.'s Br. Opp'n Def.'s Mot. at 14.)[3] Moreover, while counseling satisfies the first factor listed in the EEOC Enforcement Guidance because it is normally conducted by a mental health care professional, none of the other six factors applies to counseling, primarily because it does not involve testing. Under these circumstances, the counseling or therapy did not constitute a medical examination.[4]

Kroll fails to cite any case holding that counseling or treatment constitutes a medical examination. The Court's own research discloses only one case in which a court directly addressed whether a treatment program amounted to a medical examination. In *Jaques v. Herbert*, 447 F. Supp. 2d 858 (N.D. Ohio 2006), the court held that a substance abuse program required by the plaintiff's last-chance agreement with her employer did not amount to a "medical examination." The court reasoned that "[t]here is no evidence that the treatment program involved the assessment of Plaintiff's medical condition or the reporting of that condition back to the Company." *Id.* at 874.

---

[3] Kroll cites Dresen's deposition testimony for the proposition that WLAA "insisted that plaintiff authorize her counselor to provide records of the treatment to the defendant," but Dresen actually testified that the release was sought only to "confirm that [Kroll] was attending the weekly meetings." (Dresen Dep. at 40.)

[4] The Court rejects out of hand Kroll's suggestion that WLAA compelled her to undergo a medical test when it required her to submit to a psychological examination in connection with this lawsuit. This argument is illogical, as the examination occurred after the case was filed and Kroll was compelled to submit to the examination pursuant to Magistrate Judge Carmody's March 17, 2010, Order.

8

*Cf. Law v. Garden State Tanning*, 159 F. Supp. 2d 787, 795 (E.D. Pa. 2001) (psychiatric examination administered to the plaintiff in connection with substance abuse counseling was a medical examination, although it was job-related and a business necessity of the employer). For the same reasons, the mental health counseling at issue in this case did not amount to a medical examination. Therefore, WLAA did not violate the ADA.

## IV. Conclusion

For the foregoing reasons, the Court will grant WLAA's motion for summary judgment.

An Order consistent with this Opinion will be entered.


Dated: August 19, 2010              /s/ Gordon J. Quist
                                     GORDON J. QUIST
                                UNITED STATES DISTRICT JUDGE