*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0276p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

EMILY KROLL,

    *Plaintiff-Appellant,*

v.

WHITE LAKE AMBULANCE AUTHORITY,

    *Defendant-Appellee.*

No. 10-2348

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-626—Gordon J. Quist, District Judge.

Argued: March 8, 2012

Decided and Filed: August 22, 2012

Before: MOORE, SUTTON, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellant. Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellee. **ON BRIEF:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellant. Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellee.

    MOORE, J., delivered the opinion of the court, in which DONALD, J., joined, and SUTTON, J., joined in part. SUTTON, J. (pp. 17–18), delivered a separate dissenting opinion.

---

## OPINION

---

    KAREN NELSON MOORE, Circuit Judge. Emily Kroll ("Kroll") appeals the district court's grant of summary judgment in favor of White Lake Ambulance Authority ("WLAA"), Kroll's former employer, on claims under the Americans with Disabilities

1

Act ("ADA"). Kroll argues that the district court erred in holding as a matter of law that the counseling WLAA ordered Kroll to attend does not constitute a "medical examination" under 42 U.S.C. § 12112(d)(4)(A). WLAA contends that the district court properly granted summary judgment in its favor and asserts, for the first time on appeal, that Kroll lacks standing to bring suit. This dispute presents an issue of first impression in the Sixth Circuit as to the meaning of "medical examination" under 42 U.S.C. § 12112(d)(4)(A). For the reasons that follow, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND AND PROCEDURAL HISTORY

**A. Background**

In September 2003, Kroll began working for WLAA as an Emergency Medical Technician ("EMT") specialist. R. 1 (Complaint ¶ 6). Kroll was generally considered to be a "good EMT" and a "good employee" by her direct supervisor, Brian Binns ("Binns"). R. 50-15 (Binns Dep. at 66, 100). However, after Kroll became romantically involved with one of her co-workers at WLAA, Binns and the office manager, Jean Dresen ("Dresen"), received reports of concerns from WLAA employees about Kroll's well being. *See, e.g.,* R. 50-12 (Dresen Dep. at 27); R. 50-11 (Callison Dep. at 6, 12, 14).

Kroll maintains that on April 21, 2008 Dresen "requested" that Kroll "receive psychological counseling."[1] R. 1 (Complaint ¶ 8). Dresen informed Kroll that she had spoken with Mike Weesies ("Weesies"),[2] an administrative case manager at the Hackley Workplace Health office,[3] and that Weesies had referred Dresen to Mark Graves

---

[1] During her deposition, Dresen was reticent to testify that she believed that Kroll needed psychological counseling, but stated that she believed Kroll could benefit from talking with a "professional health care provider." R. 53-1 (Dresen Dep. at 56).

[2] Dresen stated that Weesies was WLAA's "Employee Assistance Program director." R. 50-13 (Dresen Letter at 2).

[3] Dresen testified that Hackley Workplace Health is "like" a "[w]orkers' comp[ensation] office" where WLAA would refer people injured on the job. R. 53-1 (Dresen Dep. at 35). Binns stated that Hackley Workplace Health is "a medical organization that [WLAA] could send people who had family problems, [or] had life problems" for assistance. R. 52-4 (Binns Dep. at 59-60).

("Graves") regarding the availability of counseling. R. 50-12 (Dresen Dep. at 35-36). Dresen testified that she did not know Graves's title or whether he was a mental-health professional. *Id.* at 36. Dresen told Kroll that she should contact the Red Cross regarding financial assistance for counseling, and also requested that Kroll authorize the release of her counseling records so that WLAA could monitor her attendance. *Id.* at 39-40. Dresen stated that Kroll was receptive to the idea of counseling and informed Dresen that she would pursue it "right away." R. 50-13 (Dresen Letter at 3). Kroll, on the other hand, testified that Dresen instructed her to seek counseling from Kim Jahn ("Jahn"), but that Kroll was not amenable because Jahn "was a neighbor and friend of" Dresen and Kroll had heard negative things about Jahn. R. 50-7 (Kroll Dep. at 139-40). There was no testimony as to Jahn's profession or qualifications.

A few days later on April 28, 2008, then-director of WLAA, Binns, met with Kroll and Kroll's father following a dispute between Kroll and another WLAA employee. R. 50-15 (Binns Dep. at 66); R. 1 (Complaint ¶ 10). Binns told Kroll that he had received a "complaint in regards to [Kroll] screaming at a male acquaintance [on the phone] . . . while . . . driving a vehicle loaded with a patient . . . [in] emergency status with lights and sirens." R. 52-4 (Binns Dep. at 61). Because Binns was concerned about Kroll's ability to perform her job safely, he told Kroll that she must attend counseling in order to continue working at WLAA. *Id.* at 61-62; R. 50-15 (Binns Dep. at 99). Binns testified that he didn't "think" that he "used the term 'psychological'" in describing the counseling that he asked Kroll to attend. R. 52-4 (Binns Dep. at 59). However, when asked whether it would "be fair to say" that Binns requested that Kroll "see a psychologist to discuss issues related to her mental health," Binns responded affirmatively. *Id.* at 60. Kroll told Binns that she would not attend the counseling, left the meeting, and did not return to work at WLAA. R. 53-4 (Kroll Dep. at 178). At her deposition, Kroll testified that because WLAA told her that she would have to pay for the counseling out of pocket, she "told them [she] did not have the monetary funds to seek counseling," although she would have been willing to attend the counseling if it was provided to her free of charge. *Id.*

## B. Procedural History

On May 30, 2008, Kroll filed a sex-discrimination complaint with the Michigan Department of Civil Rights ("MDCR") and the Equal Employment Opportunity Commission ("EEOC"). R. 1 (Complaint ¶ 12). On February 23, 2009, Kroll filed another complaint with the EEOC alleging ADA violations. *Id.* ¶ 13. On April 1, 2009, the EEOC and MDCR issued Kroll a right-to-sue letter for her sex-discrimination complaints, *id.* ¶ 14, and, on June 26, 2009, the EEOC issued Kroll a right-to-sue letter with respect to her ADA claims, *id.* ¶ 15.

On July 9, 2009, Kroll filed a complaint in federal district court against WLAA alleging violations of the ADA and Title VII. *Id.* ¶ 16. Specifically, Kroll contended that WLAA's demand that Kroll attend counseling was in violation of 42 U.S.C. § 12112(d)(4) of the ADA (Count 1), that WLAA improperly fired Kroll in retaliation for her refusal to attend counseling (Count II), and that WLAA discriminated against Kroll on the basis of sex by requiring that she attend counseling (Count III).

On June 9, 2010, WLAA moved for summary judgment on all counts. R. 50 (Summary Judgment Mot.). In reply, Kroll stipulated to summary judgment on Count III, R. 51 (Summary Judgment Resp. at 1 n.1), and did not present arguments in opposition to summary judgment on Count II, *see id*. On August 19, 2010, the district court granted WLAA's motion for summary judgment, concluding that "counseling alone does not constitute a medical examination under the ADA" and that, therefore, WLAA's requirement that Kroll attend counseling as a condition of continued employment was not governed by 42 U.S.C. § 12112(d)(4). R. 57 (Dist. Ct. Op. at 6).

Kroll filed a timely motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).[4]  R. 59 (Mot. to Alter Judgment). The district court

---

[4] Kroll's motion was governed by the new twenty-eight day time limit for Rule 59 motions effective December 1, 2009. *See* FED. R. CIV. P. 59(e) advisory committee's notes; 12 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 3182 (2d ed. 2012).

denied the motion on September 20, 2010. R. 61 (Dist. Ct. Order). Kroll timely appeals.[5] R. 62 (Notice of Appeal).

## II. ANALYSIS

### A. Standard of Review

"We review a district court's grant of summary judgment de novo." *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and alterations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the non-moving party." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotation marks and alterations omitted), *cert. denied*, 130 S. Ct. 3504 (2010).

### B. Standing

In this appeal WLAA asserts, for the first time, that Kroll lacks standing to bring her claim under the ADA because Kroll "never underwent the counseling" and therefore "cannot demonstrate any concrete injury." Appellee Br. at 31. Because standing is jurisdictional, we may address it at any point in the proceedings, including for the first time on appeal. *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002).

---

[5] Kroll filed a notice of appeal on October 18, 2010 seeking appeal of the district court's initial grant of summary judgment in favor of WLAA, twenty-eight days after the entry of the order denying Kroll's motion to alter or amend judgment. Kroll's notice of appeal was timely because "[u]nder Fed. R. App. P. 4(a)(4)(A)(iv), a timely Rule 59(e) motion automatically tolls the period for filing a notice of appeal." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008).

To satisfy Article III's standing requirements, a plaintiff must plead a concrete, particularized, and imminent injury in fact caused by the defendant that a favorable judicial outcome would likely remedy. *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir.) (en banc) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)), *cert. denied*, 132 S. Ct. 103 (2011). Standing to bring suit under 42 U.S.C. § 12112(d) is a somewhat contentious and confusing issue in the federal courts of appeals. *See, e.g., Indergard v. Ga.-Pac. Corp.*, 582 F.3d 1049, 1056 n.3 (9th Cir. 2009) (criticizing dissent's suggested insertion of "a proximate-causation requirement in the context of § 12112(d)(4)(A)" standing). For example, courts have confused standing with the question whether a plaintiff must be disabled to bring suit under 42 U.S.C. § 12112(d), *see, e.g.*, *Conroy v. N. Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 93-95 (2d Cir. 2003), which goes to whether "an essential element of the claim can be established," not standing, *see Griffin v. Steeltek, Inc.*, 160 F.3d 591, 593 (10th Cir. 1998) (internal quotation marks omitted), *cert. denied*, 526 U.S. 1065 (1999).[6]

The standing question at issue here is what harm, if any, a plaintiff must allege to bring suit under 42 U.S.C. § 12112(d). *See, e.g.*, *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) ("[T]he courts have required that a nondisabled plaintiff *at least* show some tangible injury-in-fact caused by the § 12112(d) violation."). Relying on precedent from other circuits, WLAA argues that a violation of 42 U.S.C. § 12112(d) does not generate a cognizable harm for standing purposes and, therefore, Kroll must point to some other harm suffered as a result. *See Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001) (stating that all federal courts of appeals to consider the issue have held that a violation of § 12112(d) is alone insufficient to confer standing); *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 561 (5th Cir. 1998) (There is no "indication either in the text of the ADA or in its legislative history that a violation . . . , in and of itself, was intended to give rise to damages liability."); *see also*

---

[6] Most courts, including this Circuit, have concluded that disability is not an element of a § 12112(d) claim, *see Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011) (citing opinions endorsing this position from the Second, Eighth, Tenth, and Eleventh Circuits); *see also Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 286 (6th Cir. 2010).

No. 10-2348           *Kroll v. White Lake Ambulance*                                    Page 7

*Indergard*, 582 F.3d at 1060 (O'Scannlain, J., dissenting). WLAA contends that Kroll cannot identify such harm because Kroll never underwent counseling and was opposed to counseling only insofar as she was required to pay for it out-of-pocket.

It is an open question in the Sixth Circuit whether a violation of 42 U.S.C. § 12112(d), by itself, generates a cognizable harm for standing purposes; however, this case does not present occasion for us to answer it. Kroll has alleged an injury proximately caused by the violation of 42 U.S.C. § 12112(d): the termination of her employment. *See Griffin*, 160 F.3d at 595 (distinguishing *Armstrong* on ground that plaintiff "sufficiently alleged . . . an injury in fact, specifically" that plaintiff was not hired as a result "of his responses to the impermissible questions"). Because we have the capacity to provide a remedy for this harm, the requirements of Article III standing are met. *See Smith*, 641 F.3d at 206.

The Fifth Circuit's decision in *Armstrong*, which WLAA urges us to apply, does not alter this result. In *Armstrong*, it was already the law of the case that the improper disability inquiry was not a proximate cause of the employer's decision not to hire the plaintiff. 141 F.3d at 560, 562; *cf. Griffin*, 160 F.3d at 595 (reaching conclusion opposite to *Armstrong*). There is no such precedent in this case, and Kroll makes a viable claim that her termination did proximately result from WLAA's instruction to attend counseling. In addition, *Armstrong* dealt with cognizable injury in the preemployment context, where an individual inherently has a weaker stake in the employment position. 141 F.3d at 556-57. Kroll alleges harm resulting from her termination after approximately four-and-a-half years of employment with WLAA. *See Indergard*, 582 F.3d at 1056 n.3 (distinguishing *Armstrong* based on its preemployment context). Although Kroll was a part-time employee and did not receive full benefits, she maintains that she worked approximately 160 to 176 hours each two-week period. R. 53-4 (Kroll Dep. at 23-24). This suggests that her employment with WLAA was a significant part of her life and livelihood, and that she had a substantial interest in maintaining her employment with WLAA.

Based on the foregoing, we conclude that Kroll has pleaded a claim for which she has Article III standing. We, therefore, now consider whether the district court properly granted summary judgment in favor of WLAA.

**C. "Medical Examination" Under 42 U.S.C. § 12112(d)(4)**

The more difficult question presented in this appeal is whether the counseling that Kroll was instructed to attend constitutes a "medical examination" under 42 U.S.C. § 12112(d)(4)(A). The district court concluded that it does not and, as a result, granted WLAA's motion for summary judgment. The district court reached this conclusion by determining categorically that "counseling alone does not constitute a medical examination under the ADA." R. 57 (Dist. Ct. Op. at 6). Construing the facts in the light most favorable to Kroll, we conclude that this decision was in error for the reasons that follow.

Title 42 U.S.C. § 12112(d)(4)(A) prohibits employers from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity."[7] Thus, employees can be instructed to undergo medical examinations by employers only "in certain limited circumstances," confined by the "job-relatedness" and "business necessity" requirements. *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998) ("[T]he statute was intended to prevent against 'medical tests and inquiries that do not serve a legitimate business purpose.'") (quoting 29 C.F.R. § 1630.13(b)). The EEOC has explained that this restriction "reflect[s] Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs." R. 52-3 (EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with*

---

[7] Pursuant to 42 U.S.C. § 12112(d)(4)(B), employers are permitted to "conduct voluntary medical examinations" and "make inquires into the ability of an employee to perform job-related functions."

No. 10-2348           *Kroll v. White Lake Ambulance*                                  Page 9

*Disabilities Act (ADA)*, at 4). In essence, the restriction strikes a balance between competing interests.

The ADA's legislative history provides little insight into the intended meaning or scope of the term "medical examination" in § 12112(d)(4).[8] As a result, the best interpretive aid is the Enforcement Guidance that the EEOC has published to explain and clarify the terms of § 12112(d)(4). The EEOC Enforcement Guidance "while non-binding 'constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Lee*, 636 F.3d at 256 (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 812 (6th Cir. 2004) (en banc)); *see also AT&T Corp. v. Hulteen*, 556 U.S. 710, 723 n.5 (2009) (same). We recently reaffirmed that the EEOC Enforcement Guidance is "very persuasive authority" in questions of statutory interpretation of the ADA. *Lee*, 626 F.3d at 256 (quoting *White*, 364 F.3d at 812) (internal quotation marks omitted).

The EEOC *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees* defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health." R. 52-3 (EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees*, at 5-6). It provides a seven-factor test for analyzing whether a test or procedure qualifies as a "medical examination" and notes that "one factor may be enough to determine that a test or procedure is medical":

(1) whether the test is administered by a health care professional;
(2) whether the test is interpreted by a health care professional;
(3) whether the test is designed to reveal an impairment or physical or mental health;
(4) whether the test is invasive;

---

[8]There is very little discussion of § 12112(d)(4) in the ADA's legislative history. There was a proposal to replace the "business necessity" requirement with a "consistent with legitimate business goals" standard, but the "business necessity" language prevailed. 1 HENRY H. PERRITT, JR., AMERICANS WITH DISABILITIES ACT HANDBOOK 22 (4th ed. 2003). In addition, the House added § 12112(d)(4)(B), which permits voluntary medical examinations and inquiries related to job performance, to the Senate-enacted version of the bill. H.R. CONF. REP. NO. 101-596 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 568-69. These pieces of legislative history do not elucidate the meaning of "medical examination."

No. 10-2348         *Kroll v. White Lake Ambulance*                                  Page 10

> (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;
> (6) whether the test normally is given in a medical setting; and,
> (7) whether medical equipment is used.

*Id.* at 6. The guidance further explains that "psychological tests that are designed to identify a mental disorder or impairment" are "medical examinations," while "psychological tests that measure personality traits such as honesty, preferences, and habits" are not. *Id.* This explanation is in keeping with the EEOC's recognition in its Enforcement Guidance on Psychiatric Disabilities that "[t]raits or behaviors are not, in themselves, mental impairments." EEOC, *Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* (1997), http://www.eeoc.gov/policy/docs/psych.html.

Thus, the EEOC instructs that to determine whether something constitutes a "medical examination" one must consider whether it is likely to elicit information about a disability, providing a basis for discriminatory treatment. The EEOC explains that prohibiting such inquiries prevents discrimination by precluding employers from obtaining information about "nonvisible disabilities, such as . . . mental illness," and then taking adverse employment actions "despite [an individual's] ability to perform the job." R. 52-3 (EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees*, at 4). The importance of § 12112(d)(4)(A) in preventing discrimination is underscored by the fact that, in contrast to many other provisions of the ADA, all individuals—disabled or not—may bring suit in aid of its enforcement. *See Lee*, 636 F.3d at 252.

Examples provided by the EEOC suggest that an employer's intent is not dispositive as to whether something qualifies as a "medical examination" under the ADA. Instead, the employer's purpose must be considered in the larger factual context of a particular test or assessment's typical uses and purposes. Consider the following

example provided by the EEOC in its *Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations*:[9]

> A psychological test is designed to reveal mental illness, but a particular employer says it does not give the test to disclose mental illness (for example, the employer says it uses the test to disclose just tastes and habits). But, the test also is interpreted by a psychologist, and is routinely used in a clinical setting to provide evidence that can be used to diagnose mental health (for example, whether an applicant has paranoid tendencies, or is depressed). Under these facts, this test is a medical examination.

EEOC, *Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations*, at 14 (1995), http://www.eeoc.gov/policy/docs/preemp.html. In this scenario, the EEOC explains, the fact that an employer's intentions are disability neutral does not save from falling within § 12112(d)(4)(A)'s purview a test routinely used and administered by psychologists to uncover mental illness. We can generalize from this scenario that when an employer's purported intentions mismatch the predominant purpose and design of a particular test or assessment, which is to uncover mental-health defects or disabilities, those intentions are accorded less weight and significance in the analysis. The following question and answer set provided by the EEOC further illustrates this point:

> May an employer give psychological examinations to applicants?
>
> That depends on whether the particular examination is *medical*. This determination would be based on some of the factors listed above, such as the purpose of the test and the intent of the employer in giving the test. Psychological examinations are medical if they provide evidence that would lead to identifying a mental disorder or impairment, listed in the American Psychiatric Association's most recent <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM).
>
> <u>Example</u>: An employer gives applicants the RUOK Test (hypothetical), an examination which reflects whether applicants have characteristics that lead to identifying whether the individual has excessive anxiety,

---

[9] There is a parallel prohibition on "medical examinations" and disability inquiries in the preemployment context pursuant to 42 U.S.C. § 12112(d)(2).

> depression, and certain compulsive disorders (DSM-listed conditions). This test is medical.
>
> . . .
>
> <u>Example</u>: An employer gives the IFIB Personality Test (hypothetical), an examination designed and used to reflect only whether an applicant is likely to lie. This test, as used by the employer, is not a medical examination.

*Id.* at 15-16 (alterations omitted).

The Seventh Circuit decision in *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831 (7th Cir. 2005), is a useful example of the application of the EEOC's guidance directives.[10] In *Karraker*, the Seventh Circuit held that an evaluation administered to employees seeking a promotion that included the Minnesota Multiphasic Personality Inventory (MMPI) constituted a "medical examination" under the ADA because the MMPI "is designed, at least in part, to reveal mental illness and has the effect of hurting the employment prospects of one with a mental disability." *Id.* at 837. The Seventh Circuit reached this decision in spite of the fact that the employer claimed to be administering the MMPI solely for the purpose of measuring personality traits, that the test was not being scored by a psychologist, and that the employer was only using "a vocational scoring protocol" as opposed to "a clinical protocol." *Id.* at 836-37. The Seventh Circuit determined that the fact that a high score on the test could be "one of several symptoms which may contribute to a diagnosis of paranoid personality disorder"

---

[10]To our knowledge, *Karraker* is the most analogous authority. While there are many cases from this Circuit interpreting and applying the "job-related" and "business necessity" exception, there are relatively few interpreting the meaning of "medical examination" in the mental-health context. *See, e.g., Prevo's Family Mkt., Inc.*, 135 F.3d at 1093-94; *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811-12 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000) (recognizing implicitly that a mental and physical fitness-for-duty examination fell within the ADA's protections and that "an employer's discretion to order employees to undergo examinations is hardly unbounded"). Because the district court did not reach the question of whether the counseling was justified under this exception, the majority of these cases are of limited utility to the present analysis. Authority is scant from other circuits as well, and most cases focus on the meaning of "medical examination" in the context of physical as opposed to mental-health evaluations. *See, e.g., Indergard*, 582 F.3d at 1058 (holding physical-capacity examination required for employee to return to work after medical leave was a "medical examination"); *Conroy*, 333 F.3d at 95-96 (holding requirement of a medical certificate containing general diagnosis before returning to work is covered by the ADA's "medical examination" provision); *Griffin*, 160 F.3d at 593-95 (holding preemployment disability inquiries were covered by the ADA).

No. 10-2348             *Kroll v. White Lake Ambulance*                    Page 13

was enough to conclude that the test was "best categorized as a medical examination" subject to the ADA's restrictions. *Id.* at 837 (internal quotation marks omitted).

With this legal backdrop we now consider Kroll's claims. Admittedly, our task is distinct from that undertaken by the Seventh Circuit in *Karraker* as the exact substance of the "counseling" Kroll was instructed to attend remains unclear and somewhat in dispute by the parties. Kroll alleges that WLAA required her to "receive psychological counseling" and "to see a mental health counselor as a condition to keeping her employment." R. 1 (Complaint ¶¶ 8, 10). In addition, Kroll points to testimony from Binns in which he agreed that it would "be fair to say" that WLAA requested that Kroll "see a psychologist to discuss issues related to her mental health." R. 52-4 ( Binns Dep. at 60). WLAA admits that it instructed Kroll to attend "counseling" as a condition of her continued employment, but contends that WLAA did not specify that the "counseling" be "psychological" in nature. *See* Appellee Br. at 12-13. As previously stated, on a motion for summary judgment, we must construe all facts in favor of the nonmoving party, which in this instance is Kroll. To the extent that the district court failed to do so, its decision was in error.[11]

To begin our analysis, it is useful to review definitions—both medical and lay—to elucidate the common meaning of "psychological counseling." The OXFORD ENGLISH DICTIONARY defines "counseling" in the psychological sense as "a form of psychotherapy in which the counsellor adopts a permissive and supportive role in enabling a client to solve his or her own problems." (2d ed. 1989). MERRIAM WEBSTER'S ENGLISH DICTIONARY defines "counseling" as "professional guidance of the individual by utilizing psychological methods especially in collecting case history data, using various techniques of the personal interview, and testing interests and aptitudes." (10th ed. 1995). TABER'S CYCLOPEDIC MEDICAL DICTIONARY defines "counseling" as "[t]he providing of advice and guidance to a patient by a health professional" and defines

---

[11] Although initially the district court refers to Kroll's allegations as relating to "psychological counseling," R. 57 (Dist. Ct. Op. at 5), the remainder of the district court's opinion refers only to "counseling" and the absence of proof of any "psychological testing," *see, e.g., id.* at 8. Accordingly, it is unclear whether the district court made this factual inference in Kroll's favor, as it should have.

"psychological" as "[pertaining] to the study of the mind in all of its relationships, normal and abnormal." (19 ed. 2001). DORLAND'S MEDICAL DICTIONARY defines "counseling" as the "provision of information, advice, and support," and "psychology" as "the branch of science that deals with the mind and mental processes, especially in relation to human and animal behavior." (32 ed. 2012).[12]

No clear or precise meaning emerges from these definitions. Some definitions suggest that "psychological counseling" is more or less passive, with the counselor serving only as an aide in the individual's own problem-solving process. Other definitions, however, tie "psychological counseling" to the science of psychology implicating the diagnosis and treatment of mental illness. Accordingly, we must consider the evidence presented by Kroll and employ the EEOC's seven-factor test to determine whether a reasonable jury could conclude that the "psychological counseling" Kroll was instructed to attend constitutes a "medical examination" under § 12112(d)(4)(A).

It is clear that both factors one and two—administration and interpretation by a health-care professional—weigh in favor of the "psychological counseling" Kroll was instructed to attend being a "medical examination." Kroll specifically alleged, and Binns provided support for the conclusion, that Kroll was instructed to attend counseling administered by a psychologist. Regardless of whether the psychologist would have acted in a passive, facilitating role, or a test-oriented, diagnostic role a reasonable jury could conclude that the psychologist would have, at minimum, done some interpretation of the content of the counseling in order to assist Kroll with her problems; indeed, this was the reason why WLAA insisted that Kroll attend the counseling. Accordingly, we conclude that a reasonable jury could find that factors one and two weigh in favor of concluding that the "psychological counseling" Kroll was instructed to attend constituted a "medical examination."

---

[12] Under this broad definition DORLAND'S also provides definitions of "abnormal psychology" as "the study of mental disorders and behavior disturbances," "clinical psychology" as the "use of psychologic knowledge and techniques in the treatment of persons with mental, emotional, behavior, and developmental disorders," and "social psychology" as "psychology that focuses on social interaction, on the ways in which actions of others influence the behavior of an individual."

No. 10-2348   *Kroll v. White Lake Ambulance*   Page 15

This brings us to factor three, arguably the most critical in this analysis: whether the "psychological counseling" was designed to reveal a mental-health impairment. As previously suggested, the answer in the abstract is somewhat ambiguous. The definitions suggest that sometimes "psychological counseling" is used for the diagnosis and treatment of mental illness; the ADA recognizes as much in stating that "psychologists" are among the "variety of health professionals [that] may provide documentation regarding psychiatric disabilities" for ADA purposes. EEOC, *Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* (1997), http://www.eeoc.gov/policy/docs/psych.html. However, psychological counseling need not always be targeted to mental-health diagnosis—sometimes patients seek psychological counseling and specifically request that no mental-health diagnosis be made. In this instance, based on the evidence presented by Kroll, a reasonable jury could conclude that the psychological counseling Kroll was instructed to attend was the type designed to uncover a mental-health defect. WLAA does not dispute that it was concerned about Kroll suffering from depression, to the point of suicidal ideation, and Binns stated in his deposition that he instructed Kroll to go to the counseling "to discuss issues related to her mental health." R. 52-4 (Binns Dep. at 60). These facts are sufficient for a reasonable jury to conclude that WLAA intended for Kroll to attend counseling to explore her possible affliction with depression, or a similar mental-health impairment, so that she could receive the appropriate corresponding treatment. This uncovering of mental-health defects at an employer's direction is the precise harm that § 12112(d)(4)(A) is designed to prevent absent a demonstrated job-related business necessity.

With respect to factors four, five, six, and seven, the paucity of information with which we have to evaluate their application makes it difficult to decide whether they weigh in favor of or against concluding that the counseling Kroll was instructed to attend constituted a "medical examination" under the ADA. Rather than speculate, we decline to comment on these factors because ultimately none is dispositive to our analysis. Upon considering factors one, two, and particularly three, we conclude that Kroll has presented sufficient evidence such that a reasonable jury could conclude that the "psychological

counseling" Kroll was instructed to attend did constitute a "medical examination" under the ADA. We reach this conclusion, consistent with the reasoning of the Seventh Circuit, because the "psychological counseling" in question was likely to probe and explore whether Kroll suffered from a mental-health disability, regardless of whether this was WLAA's intention. *See Karraker*, 411 F.3d at 837; *see also Barnes v. Cochran*, 944 F. Supp. 897, 904-05 (S.D. Fla. 1996) (concluding that preemployment psychological evaluation constituted a "medical examination" because the "nature and extent" of the evaluation was such that it tended towards "identifying a mental disorder or impairment") (internal quotation marks omitted). Consequently, we hold that summary judgment in favor of WLAA was improper.

We recognize that even if Kroll's instruction to undergo "psychological counseling" is governed by § 12112(d)(4)(A) of the ADA, WLAA may still be entitled to summary judgment if such counseling was "job related" and consistent with "business necessity." Because the district court did not decide this question in the first instance, the parties have not briefed it on appeal. Accordingly, the proper course is to remand the case to the district court for decision in the first instance.

### III. CONCLUSION

Based on the foregoing, we **VACATE** the judgment of the district court granting summary judgment in favor of WLAA and **REMAND** for proceedings consistent with this opinion.

---

**DISSENT**

---

SUTTON, Circuit Judge, dissenting. I agree with the majority in every way but one: I cannot agree that a requirement to obtain psychological counseling amounts to a requirement to obtain a medical examination.

The relevant provision says:

> A covered entity *shall not require a medical examination* and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A) (emphasis added). The determinative words are "require" *and* "medical examination," not just "medical examination." The law bars a required medical examination—and that did not happen. When Kroll, an emergency medical technician, showed on-the-job distress over an affair with a married co-worker, principally through several outbursts at work, her employer, the White Lake Ambulance Authority, understandably tried to do something about it. The employer, however, did not compel Kroll to take a medical examination. It compelled her to obtain psychological counseling, allowing her to obtain it on her own terms and with any counselor she wished. The employer had no interest in the outcome of the counseling, no interest in any potential diagnosis, no interest in the type of counseling she received, no interest in anything at all save verification that she obtain some form of counseling if she was going to continue providing EMT services for the ambulance company.

By any definition, compelled counseling does not compel a medical examination. As the EEOC guidelines recognize, some "psychological tests" amount to medical examinations, and others do not. EEOC, *Enforcement Guidance: Disability - Related Inquiries and Medical Examinations of Employees*, at 5 ("psychological tests that are designed to identify a mental disorder or impairment" are medical exams, but

"psychological tests that measure personality traits such as honesty, preferences, and habits" are not). No evidence shows that White Lake Ambulance insisted that Kroll's psychological counseling involve one type of test or another. No evidence, indeed, shows that the ambulance service insisted she submit to *any* test while obtaining counseling. The majority acknowledges the same point. As it explains, a psychological-counseling requirement covers a range of treatments, some including "medical examinations," some not. Maj. Op. at 10.

The breadth of services encompassed by a psychological-counseling requirement resolves this claim. For it means that *Kroll*, not the company, controlled her destiny—controlled in other words whether she sought counseling that included a medical examination or did not. No doubt, she might meet this requirement by seeing a psychologist or psychiatrist who used a medical examination. But, if so, that was her choice, not the company's. If a trying boss insists that an employee arrive at work by eight o'clock the next morning, it is not the boss's fault if the employee opts to meet the requirement by staying overnight in the office. So it is here. Kroll had the right to meet this counseling requirement on her own terms, some of which could lead to a medical examination and others of which would not. Because White Lake Ambulance did not "require" Kroll to obtain a "medical examination," I must respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 10-2348

```
                                    ┌─────────────────────────┐
                                    │         FILED           │
                                    │     Aug 22, 2012        │
                                    │   LEONARD GREEN, Clerk  │
                                    └─────────────────────────┘
```

EMILY KROLL,

    Plaintiff - Appellant,

v.

WHITE LAKE AMBULANCE AUTHORITY,

    Defendant - Appellee.

Before: MOORE, SUTTON, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court granting summary judgment in favor of WLAA is VACATED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Leonard Green, Clerk

<table>
<tr><td>Leonard Green<br>Clerk</td><td style="text-align:center">UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT<br>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed: August 22, 2012

Mr. Michael S. Bogren
Plunkett Cooney
950 Trade Center Way
Suite 310
Kalamazoo, MI 49002

Mr. Bradley Kurt Glazier
Bos & Glazier
990 Monroe Avenue, N.W.
Grand Rapids, MI 49503-0000

Re: Case No. 10-2348, *Emily Kroll v. White Lake Ambulance Authority*
Originating Case No. 1:09-cv-626

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                        Yours very truly,

                                        Leonard Green, Clerk


                                        Dixie Aerni
                                        Deputy Clerk


Enclosures

Mandate to issue.